Melody SPENCER, Appellant,

v.

Karl ZOBRIST, et al., Respondents.

No. WD 71364.

Missouri Court of Appeals,
Western District.

June 29, 2010.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 31, 2010.

Application for Transfer Denied
Nov. 16, 2010.

Morgan L. Roach, Kansas City, MO, for Appellant.

James F. Ralls, Jr., Liberty, MO, for Respondents.

Before THOMAS H. NEWTON, C.J., JAMES EDWARD WELSH, and ALOK AHUJA, JJ.

JAMES EDWARD WELSH, Presiding Judge.

Melody Spencer seeks judicial review of the Kansas City Board of Police Commissioners' decision to terminate her employment as a police officer with the Kansas City Police Department. The Board[1] found that Spencer violated Department policies by failing to seek medical help for a sick arrestee who requested medical attention and by treating the arrestee in a discourteous and undignified manner. The circuit court affirmed the Board's decision to terminate Spencer's employment, and Spencer appeals. On appeal, Spencer asserts that the Board failed to determine whether cause existed to terminate her employment and that the Board applied the wrong legal standard in terminating her. She also contends that cause did not exist to terminate her because (1) she was not on fair notice of the Board's "expansive interpretation" of the Department's policy which required her to seek medical help for a sick person who requested medical attention, (2) she was not rude to the

---

1. The Board members were Karl Zobrist, Terry J. Brady, Mark C. Thompson, James B. Wilson, and Kansas City Mayor Mark Funkhouser.

arrestee, and (3) the Board failed to determine that termination was the appropriate degree of discipline in this case. We affirm.

On February 5, 2006, at 10:45 p.m., Spencer and her partner, Officer Kevin Schnell,[2] were on patrol in the area of Ninth and Prospect in Kansas City. As part of a special project with the Department of Revenue, they were looking for vehicles with fake temporary license tags. When they saw an unoccupied car with no license tags parked outside of a liquor store, they pulled over and waited for the driver of the car to return. They watched as Sophia Salva came out of the liquor store, walked over to another car, and began talking to the occupants of that car. After talking for a while, Salva walked over to the unoccupied car. Salva got into the car, crawled into the back seat, and taped a temporary license tag in the back window. Salva then got into the driver's seat and pulled out of the parking lot.

Suspecting that Salva's temporary license tag was fake, Spencer and Schnell followed her and eventually stopped Salva's car at Ninth and Brooklyn. Spencer's and Schnell's patrol car was equipped with a video camera that was activated once Salva's car was stopped. The video camera recorded the events and conversations that occurred during the traffic stop.

Schnell got out of the patrol car and approached Salva's car. Schnell told Salva that she had been stopped because she had a fake temporary license tag in her back window. Within thirty seconds of Schnell's initiating this conversation, Salva told him, "I'm having [a] miscarriage." Less than one minute into the stop, Salva told Schnell, "I have a problem. I am bleeding. I took this car, and I want to go to the hospital."

Schnell then asked Salva if she had a driving license. Salva said that she did not know where her license was. When Schnell asked Salva if she had any identification, Salva replied, "Can the lady [referring to Spencer]? check me? I'm bleeding. I have three month baby inside." Schnell asked Salva for a driving license and summoned Spencer to Salva's car. When Spencer approached, Salva told both officers that she wanted to go to the emergency room.

Schnell told Spencer that Salva was "just giving me a long line of excuses, says she's bleeding. She says you can check." Salva reiterated that Spencer could check her. Schnell told Salva that Spencer was not a doctor. Schnell again asked Salva if she had identification with her, and Salva said that she did not. Schnell told Salva to exit her car, and she did. After Salva got out of her car, Schnell told Spencer that Salva claimed to be three months pregnant. Upon hearing this, Salva added, "I'm three months pregnant and I'm bleeding."[3]

When Spencer asked Salva why she was at the liquor store placing a fraudulent temporary license tag in her car window, Salva responded, "I put it because I want

**2.** The Board also terminated Schnell's employment with the police department. Schnell appeals from that decision, and we hand down that opinion simultaneously with this case. *Schnell v. Zobrist,* 323 S.W.3d 403 (Mo.App. W.D.2010).

**3.** Spencer testified that she believed that Salva was lying about her medical condition because Salva did not appear to her to be in

pain or discomfort or have any physical signs of a miscarriage, especially since they had observed Salva at the liquor store climbing into the back seat of her car to affix the temporary tag to her back window. Because Salva was being nonresponsive and evasive in her answers to the officers' questions, Spencer believed that Salva was lying to avoid going to jail.

to go to the hospital." Spencer then frisked Salva, and Salva asked Spencer twice to check her underwear for blood. When Spencer refused, Salva stated that she wanted to go to the hospital. Salva then said something, but the response is inaudible on the videotape. Spencer replied, "How is that my problem?" Spencer then requested that Salva sit on the street curb. Salva motioned toward her stomach and said, "My stomach's pain." Spencer replied, "You're only three months pregnant. Have a seat." When Spencer indicated that Salva would be handcuffed if she refused to sit on the curb, Salva held out her hands and said, "Handcuff me instead." Salva again spoke to Spencer and said, "You are a woman like me," to which Spencer replied, "I know that." Salva then said, "See my underwear? . . . Please. Do you see the blood? Look down." Spencer responded, "[I]t's called a menstrual cycle. I understand. OK? 'Cause I am a woman." Salva said two more times that she wanted to go to the hospital.

Spencer and Schnell discussed Salva's lack of identification, and Spencer told Salva, "Right now we're just looking into numerous traffic violations." After Salva again stated that she wanted to go to the hospital and asked Spencer and Schnell whether she could go to the hospital, Spencer and Schnell continued to discuss Salva's lack of identification. Spencer then asked Salva for her name and asked her repeatedly to spell her first name. Confused about the correct spelling of Salva's first name, Spencer asked Salva, "Spell it for me one more time. Let's try to get it right this time." Salva responded, "I don't understand," and Spencer said, "Spell your first name." Salva did not answer but again said, "I'm bleeding . . . look at the blood[.]" Spencer replied, "It's a menstrual cycle. What is your first name? Spell it." Spencer continued to be confused about the spelling of Salva's first name and told Salva, "Let me make one thing clear with you. We can do this the easy way or the hard way." Salva responded, "Because I am sick." Spencer replied, "Don't cop an attitude with me! . . . It's called a menstrual cycle." When Salva pleaded, Spencer said, "No, I'm not dealing with you anymore . . . . This can go smoothly, or we can drag it out. It's your choice." During the next fifteen minutes of the stop, Salva mentioned wanting to go to the hospital three more times, told the officers that she was bleeding three more times, and said that she had a baby in her stomach one more time.

When Schnell and Spencer obtained Salva's correct identifying information, they learned that she had several municipal warrants and placed Salva under arrest. The officers contacted dispatch and requested a transportation wagon to take Salva to Department headquarters. At no time did either Schnell or Spencer procure transportation for Salva to be taken to a hospital.

When the transportation wagon arrived at 11:12 p.m., Salva asked Schnell and Spencer if they could report her bleeding. Schnell responded, "Will do. When we take you to the station you'll be able to report all that. We'll get this stuff taken care of." Spencer added, "And they'll be able to give you a product to help you stop that," referring to the bleeding. The transportation wagon took Salva to Department headquarters at approximately 11:20 p.m., where she was incarcerated.[4]

4. According to Spencer, she believed that jail personnel would screen Salva for any medical issues upon intake. The Internal Affairs investigative file indicates that Salva told jail personnel that she was pregnant and bleeding. Indeed, jail personnel observed blood in

While still incarcerated during the morning hours of February 6, 2006, Salva passed at least one blood clot, leaked blood and bodily fluid, and experienced abdominal cramping. Around 9:00 a.m., Salva was taken by ambulance to the hospital. Several hours later, she delivered a very premature baby that did not survive. Salva had been approximately fifteen weeks pregnant.

On February 5, 2007, the Board directed that Police Chief James Corwin conduct an Internal Affairs Unit investigation into the matter. After the investigation, Corwin recommended that Spencer's employment with the Department be terminated. Thereafter, on February 20, 2007, Corwin filed charges and specifications with the Board, alleging that Spencer: (1) violated Department Procedural Instruction 98–7 by failing to arrange for Salva to receive medical attention after she pleaded for it and (2) violated Department Personnel Policy 201–7 by making discourteous and undignified statements to Salva in a condescending, demeaning, and patronizing manner.

Spencer requested a hearing and, pursuant to a Board policy, elected that a hearing officer [5] hear the matter. Following the hearing, the hearing officer issued findings of fact and conclusions of law. The hearing officer concluded that Spencer thought she had discretion with respect to when to call an ambulance and that the Board had not trained or told officers that they have no discretion under the rule. The hearing officer also concluded that Spencer's language and demeanor were appropriate and professional considering the circumstances of the stop. The hearing officer recommended that Spencer be reinstated as a police officer, with full back pay and benefits.

The Board reviewed the evidence that was presented to the hearing officer and scheduled a hearing to receive additional evidence. In its subsequent findings of fact and conclusions of law, the Board determined that Corwin had met his burden of proof on the two charges and that Spencer's termination was the appropriate remedy. The Board terminated Spencer's employment with the Department.

Spencer filed a petition for judicial review of the Board's decision in the circuit court. The circuit court affirmed the Board's decision. Spencer appeals.

■ On appeal from the circuit court's review of an agency's decision, we review the agency's actions and not those of the circuit court. *Albanna v. State Bd. of Registration for Healing Arts,* 293 S.W.3d 423, 428 (Mo. banc 2009). Our review is limited to determining whether the Board's decision was constitutional; was within the Board's statutory authority and jurisdiction; was supported by competent and substantial evidence upon the whole record; was authorized by law; was made upon lawful procedure with a fair trial; was not arbitrary, capricious or unreasonable; or was a proper exercise of discretion. *Lagud v. Kansas City Bd. of Police Comm'rs,* 136 S.W.3d 786, 791 (Mo. banc 2004); § 536.140.2, RSMo Cum.Supp. 2009. In reviewing the Board's decision, we must consider the entire record and not simply the evidence that supports the Board's decision. *Coffer v. Wasson–Hunt,* 281 S.W.3d 308, 310 (Mo. banc 2009). "If the evidence permits either of two opposing findings, deference is afforded to the

the crotch area of Salva's pants and gave Salva a pair of paper pants. Salva, however, was not provided any medical care until the next morning.

5. The hearing officer was the Honorable William F. Mauer.

administrative decision." *Id.* We, however, do not defer to the Board's decision on questions of law. *Vivona v. Zobrist,* 290 S.W.3d 167, 171 (Mo.App.2009).

 In her first point, Spencer complains that the Board erred in terminating her employment because it failed to determine whether there was cause for termination. Section 84.600, RSMo 2000, governs the discharge, removal, and discipline of police officers in Kansas City. Spencer, a non-probationary police officer, was "subject to discharge or removal only for cause." [6] § 84.600. In its order terminating Spencer, the Board found that Spencer violated two Department policies and that termination of her employment was an appropriate remedy for her actions. Because, however, the Board did not expressly state that Spencer's actions in violating the policies constituted "cause" for termination, Spencer argues that the Board failed to determine whether there actually was cause.

 Although section 84.600 does not define "for cause," the Missouri Supreme Court has defined the term as it is used in section 84.150, RSMo Cum.Supp.2009, an analogous statute governing the removal of police officers in St. Louis. In construing statutes, " 'it is appropriate to take into consideration statutes involving similar or related subject matter when such statutes shed light upon the meaning of the statute being construed[.]' " *State ex rel. Nixon v. Smith,* 280 S.W.3d 761, 767 (Mo.App.2009) (quoting *Citizens Elec. Corp. v. Dir. of Dep't of Revenue,* 766 S.W.2d 450, 452 (Mo. banc 1989)). This is because " '[w]hen the legislature enacts a statute referring to terms which have had other judicial or legislative meaning attached to them, the legislature is presumed to have acted with

knowledge of that judicial or legislative action.' " *Id.* (quoting *Citizens Elec. Corp.,* 766 S.W.2d at 452). Moreover, when a statute does not define a term but the term "has a recognized common law meaning, it will be understood that the General Assembly intended to employ that meaning." *Id.*

Like section 84.600, section 84.150 provides that police officers are "subject to removal only for cause." In *McCallister v. Priest,* 422 S.W.2d 650, 657 (Mo. banc 1968), the Missouri Supreme Court said that the term "for cause" "means legal cause." *Id.* Specifically, the cause " 'must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public.' " *Id.* (citations omitted).

In its order, the Board made findings that clearly demonstrate how Spencer's policy violations related to and affected the administration of the office and were of a substantial nature directly affecting the rights and interests of the public. Specifically, the Board found that:

> 44. Officer Spencer's decision not to seek medical attention for Ms. Salva demonstrates a dangerous lack of concern for public health and safety, in that Officer Spencer lacks the judgment necessary to appropriately interpret and apply Procedural Instruction 98–7.
>
> . . . .
>
> 49. Officer Spencer's failure to recognize that her treatment of Ms. Salva was disrespectful, coupled with Officer Spencer's belief that she maintained professionalism in her dealing with Ms. Salva, reflect poor judgment as to the

---

**6.** Termination for cause distinguishes certain types of employment from at will employment, which is presumed in most employee/employer relationships.

manner of conduct expected of an employee of the Department.

. . . .

51. Officer Spencer's actions of making a determination as to Ms. Salva's medical condition, refusing to call for medical attention when requested, and treating Ms. Salva in a discourteous and undignified manner are prejudicial to the good order and discipline of the Department, bring discredit upon the Department, and adversely affect and undermine public respect and confidence in the Department.

These findings concerning Spencer's violations of Department policies by refusing to provide transportation to a sick arrestee and by treating the public in a discourteous and undignified manner articulate how Spencer's actions related to and affected the administration of the office and were of a substantial nature directly affecting the public's rights and interests. The findings fall squarely within the Missouri Supreme Court's definition of the cause necessary for discharging a police officer. That the Board did not use the specific word "cause" in its order is of no consequence.[7] By finding that Spencer (1) demonstrated a "dangerous lack of concern for public health and safety"; (2) lacked the judgment necessary to interpret and apply certain policies and to conduct herself properly as a Department employee; (3) brought discredit upon the Department; and (4) acted in such a manner that was "prejudicial to the good order and discipline of the Department" and that "adversely affect[ed] and undermine[d] public respect and confidence in the Department," the Board found that there was cause to terminate her employment. To hold otherwise would be to exalt form over substance. We deny Spencer's first point.

■ In her second point, Spencer claims that the Board applied the wrong legal standard in terminating her. Chief Corwin was the moving party in this action and, therefore, bore the burden of proving that Spencer's employment should be terminated for cause. *Heidebur v. Parker*, 505 S.W.2d 440, 444 (Mo.App.1974). Corwin was required to prove his case by a preponderance of the evidence. *Fujita v. Jeffries*, 714 S.W.2d 202, 206 (Mo.App. 1986).

In its conclusions of law, the Board stated that Corwin met his burden of proof, but it did not specify what that burden was. Twice in the order, the Board stated that there was "competent and substantial evidence" to support its decision. Because of these statements, Spencer argues that

---

7. To support her argument that the only way for the Board to demonstrate that it terminated her for cause was to make a finding using the express language "for cause," Spencer cites *Bodenhausen v. Missouri Board of Registration for Healing Arts*, 900 S.W.2d 621 (Mo. banc 1995), and *Bowen v. Missouri Department of Conservation*, 46 S.W.3d 1 (Mo.App. 2001). Neither case stands for such a proposition. In *Bodenhausen*, the Board of Registration for the Healing Arts asserted that it could discipline a physician without ever filing a complaint with the Administrative Hearing Commission. 900 S.W.2d at 622–23. The Missouri Supreme Court disagreed, ruling that, before the Board could discipline a physician, the Board had to file a complaint with the Commission and the Commission had to find cause for discipline in its written findings of fact and conclusions of law. *Id.* The Court did not address what language the Commission had to include in its order indicating that it found cause. Similarly, in *Bowen*, we held that the Department of Conservation had to determine whether terminating a non-merit employee was "not for the good of the service," but we did not address what language the Department had to include in its order indicating that it made this determination. 46 S.W.3d at 10–11. Thus, the issue in *Bodenhausen* and *Bowen* was not the wording of the agencies' statutorily-required determinations but the agencies' failure to make those determinations at all.

the Board did not hold Corwin to the preponderance of the evidence standard but, instead, held him to the lesser competent and substantial evidence standard. We disagree. When the Board's order is considered in its entirety, it is clear that the Board held Corwin to the preponderance of the evidence standard of proof and that its references to there being competent and substantial evidence to support its decision were merely superfluous.[8]

■ Initially, we note that the two standards differ in function, definition, and application. Preponderance of the evidence is a standard of proof, that is, "[t]he degree or level of proof demanded in a specific case." BLACK'S LAW DICTIONARY 1535 (9th ed.2009). "Preponderance of the evidence is that which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not." *Fujita,* 714 S.W.2d at 206.

■ The competent and substantial evidence standard is not a standard of proof but, rather, is a standard of judicial review of an administrative agency's decision pursuant to section 536.140.2, RSMo Cum. Supp.2009.[9] *Tate v. Dep't of Soc. Servs.,* 18 S.W.3d 3, 7–8 (Mo.App.2000). Substantial evidence, which necessarily implies competent evidence, means:

> "[E]vidence which, if true, has probative force upon the issues, i.e., evidence favoring facts which are such that reasonable men may differ as to whether it

establishes them; it is evidence from which the trier or triers of the fact reasonably could find the issues in harmony therewith; it is evidence of a character sufficiently substantial to warrant the trier of facts in finding from it the facts, to establish which the evidence was introduced."

*Fujita,* 714 S.W.2d at 206 (quoting *Collins v. Div. of Welfare,* 364 Mo. 1032, 270 S.W.2d 817, 820 (1954)).

■ Both parties to a contested matter can present substantial evidence. *Id.* Indeed, when a court reviews the record to determine if an agency's decision is supported by competent and substantial evidence, it may also find that there is competent and substantial evidence in the record to support a contrary decision. *See Lagud,* 136 S.W.3d at 791 n. 5.[10] In contrast, only one party can meet the preponderance of the evidence standard. *Fujita,* 714 S.W.2d at 206. This is because, unlike in determining whether competent and substantial evidence supports an agency's decision, in determining whether the preponderance of the evidence supports a party's position, the trier of fact must resolve conflicting evidence and decide "which of the parties' positions [is] more probable, more credible and of greater weight." *Id.*

The trier of fact in this case—the Board—did exactly that. Corwin presented evidence establishing that Spencer's decision not to call an ambulance for Salva was unreasonable under the totality of the circumstances and that Spencer spoke to Salva in a condescending, demeaning, and patronizing manner. Spencer then pre-

---

8. Perhaps, because this court reviews the Board's decision to assure that it is supported by competent and substantial evidence, the Board was attempting to persuade us that, at least in its opinion, such evidence existed.

9. Section 536.140.2(3) provides that, in reviewing an agency's decision, circuit and ap-

pellate courts determine whether or not the decision is supported by competent and substantial evidence on the whole record.

10. In such circumstances, the court is to affirm the agency's decision. *Lagud,* 136 S.W.3d at 791 n. 5.

sented evidence to refute the charges against her. She offered evidence that her decision not to call an ambulance for Salva was reasonable under the totality of the circumstances and that her comments to Salva were professional and were used to establish "command presence." The Board's findings of fact and conclusions of law clearly show that it resolved the conflicts in the evidence against Spencer and determined that Corwin's position was more probable, credible, and of greater weight or more convincing than Spencer's position. Thus, the Board applied the correct preponderance of the evidence standard of proof. The Board's determination that there was competent and substantial evidence to support its decision was superfluous, as that was a determination for a reviewing court to make.[11] We deny Spencer's second point.

In her third point, Spencer claims that cause did not exist to terminate her because (1) she was not on fair notice of the Board's "expansive interpretation" of the Department's policy which required her to seek medical help for a sick person who requested medical attention, (2) she was not rude to Salva, and (3) the Board failed to determine that termination was the appropriate degree of discipline in this case. We disagree.

The Board found that Spencer violated Department Procedural Instruction 98–7, entitled "Ambulance Calls and Arrests Taken to Hospitals." This policy states: "Officers will procure transportation for a sick or injured person when requested or appropriate." The plain language of this policy does not give an officer any discretion in procuring transportation for a sick person when requested.

■ Spencer does not assert that she was unaware of this policy; rather, she contends that she did not have notice of the Board's "expansive interpretation" of the policy. The Board found that Spencer was "on fair notice that calling an ambulance is the Department's policy when an arrestee requests medical attention and when it is not clear, based on factors plainly visible to the officer, that medical attention is not needed." Spencer contends that she was not on "fair notice" of the uncommunicated policy requirements imposed by this "expansive interpretation."

Chief Corwin testified that an officer has no discretion when deciding to call for transportation when a sick or injured person requests medical attention.[12] Corwin said that, although he never advised Spencer or instructed anyone else to advise Spencer about the Board's interpretation of the policy, it was the clear understanding of the Department that, if somebody asks for medical aid, an officer should get help for that person and should not make the decision whether or not medical help is needed. Corwin said

---

11. We acknowledge that, in *Fujita*, this court's Eastern District did not examine the entirety of the order to determine if the agency actually applied the preponderance of the evidence standard. 714 S.W.2d at 206. In *Fujita*, however, the administrative agency specifically referred to the competent and substantial evidence standard as the standard of proof, as it stated in its order that the nonprevailing party "did not establish by competent and substantial evidence" the required allegations. *Id.* at 207. Moreover, because the agency's adoption of the competent and substantial evidence standard actually benefited the appellant, the court's inquiry ended there. *Id.* at 206. That is not the case here.

12. At the hearing before the Board, Corwin acknowledged that all procedural instructions of the Department carry with them the obligation to carry out the policies exercising sound discretion, but he noted that Procedural Instruction 98–7 requires an officer to provide an ambulance to a person who requests one.

that, regardless of the circumstances, officers have been trained and understand that if anybody says he or she wants medical attention, an officer should at least order it and let the medical people make the decision regarding whether medical attention is needed. Corwin said that, when he was a field training officer, a field sergeant, and a commander, it was his experience that, when somebody asked for medical attention, they would call for an ambulance. Corwin said that he has been on the job for almost twenty-eight years and that it has been the Department's pattern and practice to call for an ambulance when a person says he or she has a medical issue.

Major Mark Dumolt agreed with Corwin that an officer has no discretion when deciding to call for transportation when a sick or injured person requests medical attention. Dumolt said that the traditional past practice for the twenty-eight years that he has been with the Department is that the policy required an officer to call for an ambulance or seek medical attention for a person who requests it. He stated that in his experience that was the policy even for persons who were not really sick or injured. Dumolt said that officers are not qualified to make decisions whether a person needs medical attention.

Deputy Chief Rachel Whipple testified that the policy obligates an officer to call for an ambulance when a person requests medical attention. She said, "The only exception that I can think of would be if a person comes up and said someone just cut off my hand, and you look and both hands are firmly attached, I don't believe it would be appropriate to call an ambulance for that person." [13] Whipple said, however, that "anything that requires a determination as to whether or not they're sick or

injured should be made by medical personnel; not us."

The Board concluded, apparently based upon Whipple's noted exception, that it is the Department's policy to call for an ambulance when an arrestee requests medical attention and "when it is not clear, based on factors plainly visible to the officer, that medical attention is not needed." Spencer's point on appeal is that she was not on fair notice of her obligations under this "expansive interpretation." But, Corwin's and Dumolt's testimony demonstrates that it has been the custom and practice of the Department for each of their twenty-eight years of service for an officer to call for an ambulance when a person says that he or she has a medical issue. It is reasonable to infer that, since it was the custom and practice of the Department for twenty-eight years to call an ambulance when an arrestee requests medical attention, Spencer had fair notice of this policy. Whipple's opinion that an officer may not have to call an ambulance in a situation which is so obvious to the officer that the person does not need medical attention, e.g., a person says his hand has been cut off and the officer sees that both hands are firmly attached, is not an expansive interpretation of the policy requiring additional notice to officers. Rather, it is an interpretation based upon common sense and an interpretation that does not render the Department's policy absurd. Whipple's exception and the Board's finding based upon this exception merely show a circumstance in which the policy would not apply. Such circumstances were not even present in this case.

That Spencer allegedly did not know of the Board's "expansive interpretation" of the policy does not aid her argument that

---

**13.** At the hearing before the Board, Chief Corwin also acknowledged that the officer

would not have to procure transportation for the individual in such circumstances.

she had discretion to determine whether or not she needed to procure transportation for Salva under the circumstances in this case. Spencer admits that she was aware of the Department's policy requiring her to call for an ambulance when a sick or injured person requests medical help. Spencer's interpretation of the policy—that she was allowed to determine whether the person was sick or injured before calling for an ambulance—undermines the very purpose of the Department's policy. The purpose of the policy is to require officers to procure transportation for a sick or injured person when requested so that the officers do not have to make the determination whether medical attention is needed. Under the policy, Spencer had to procure transportation for Salva once Salva requested it. Substantial and competent evidence supports the Board's decision that Spencer was on fair notice of the Department's policy.

■ Spencer next claims that there was not cause to terminate her because the Board's determination that she was rude to Salva lacked evidentiary support. In its order, the Board found that Spencer "spoke to Ms. Salva in a condescending, demeaning, and patronizing manner" and that Spencer's treatment of Salva was discourteous and undignified. In particular, the Board found to be disrespectful (1) Spencer's referring to Salva's bleeding as merely a menstrual cycle, (2) Spencer's telling Salva she could sit on the curb since Salva was "only three months pregnant," (3) Spencer's asking Salva how her desire to go to the hospital was Spencer's problem, (4) Spencer's implying that Salva could not spell her own first name, (5) Spencer's telling Salva that they could "do this the easy way or the hard way," and (6) Spencer's responding to one of Salva's requests for medical attention by saying, "No, I'm not dealing with you anymore."

The Board concluded that Spencer's statements to and treatment of Salva violated Department Personnel Policy 201–7, which required that officers treat the public with courtesy, consideration, and dignity.

Spencer contends that her remarks to Salva were not derogatory or discourteous. She argues that she did not intend to be rude to Salva but that she was merely attempting to project a command presence. Spencer contends that the videotape shows that, rather than being rude, she was very professional and authoritative during the Salva stop.

The Board, however, watched the videotape of the stop and, therefore, could judge Spencer's demeanor and the context in which Spencer made these remarks. The Board also heard testimony and statements from officers in Spencer's chain of command who opined, based upon their experience in the Department, that Spencer was discourteous to Salva.[14] The Board had substantial evidence to support its decision that Spencer treated Salva disrespectfully and, in doing so, violated Department Personnel Policy 201–7. Although Spencer presented evidence that would have supported a contrary decision, we defer to the Board's findings. *Coffer*, 281 S.W.3d at 310.

■ Finally, Spencer contends that cause did not exist to terminate her because the Board failed to determine that termination was the appropriate degree of discipline in this case. In particular, she contends that because the Board determined that termination was "*an* appropriate remedy"—instead of *the* appropriate remedy—the finding was insufficient. The result of the Board's decision in this case was termination of Spencer's employment. The Board, therefore, determined that termination was the appropriate remedy for Spencer's policy violations in this case.

---

**14.** We presume that they also had the benefit of viewing the videotape.

Spencer contends that, even if we determine that the Board's finding was sufficient, we should reverse because the finding of termination lacks evidentiary support. In particular, Spencer points to evidence that one of the officers in her chain of command did not recommend termination and that, because Spencer had never been disciplined by the Department and had received numerous commendations,[15] the Department should have followed progressive discipline.[16] The statutes governing the Board do not, however, require the Board to follow recommendations of the chain of command or to follow progressive discipline. Section 84.600 provides that the Board may remove, suspend, reprimand, or impose a fine upon the officer for violations of Department rules and regulations. Section 84.600 further provides that "[e]ach decision of the police board in such cases shall be final[.]" In addition, although the police chief disciplines the officers, section 84.610, RSMo 2000, gives the Board on review of the chief's decision "the power … to affirm, modify or reverse such action of the chief and may make such other orders as the board may deem necessary." Section 84.610 also states that "[e]ach decision of the police board in such cases shall be final." Moreover, pursuant to section 84.460, RSMo 2000, the Board has exclusive power to manage and control the police force.

Thus, it was within the Board's discretion to terminate Spencer for violating the Department policies by failing to seek medical help for Salva when she requested medical attention and by treating Salva in a discourteous and undignified manner. We will not substitute our judgment for the Board's in the absence of an abuse of that discretion. *See Vivona,* 290 S.W.3d at 174. We find no such abuse of discretion in this case. We deny Spencer's third point.

Competent and substantial evidence supported the Board's decision that cause existed to terminate Spencer's employment with the Department due to Spencer's failing to seek medical help for Salva and her treating Salva in a discourteous and undignified manner. The Board's decision was not arbitrary, capricious, or unreasonable. We, therefore, affirm the Board's decision terminating Spencer's employment with the Department.

All concur.

---

**15.** The record establishes that Spencer had received more than twenty commendations for her years of service with the Department and that, prior to this incident, she had never been disciplined by the Department.

**16.** In Spencer's brief, she also asserts that, if we find that she committed only one out of the two alleged policy violations, either one of these violations, standing alone, would be insufficient to impose termination. We need not address this contention because competent and substantial evidence existed establishing that Spencer violated both policies.