**Kevin SCHNELL, Appellant,**

v.

**Karl ZOBRIST, et al., Respondents.**

**No. WD 71365.**

Missouri Court of Appeals,
Western District.

June 29, 2010.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 31, 2010.

Application for Transfer Denied
Nov. 16, 2010.

---

Morgan L. Roach, Kansas City, MO, for Appellant.

James F. Ralls, Jr., Liberty, MO, for Respondents.

Before THOMAS H. NEWTON, C.J., JAMES EDWARD WELSH, and ALOK AHUJA, JJ.

JAMES EDWARD WELSH, Judge.

Kevin Schnell seeks judicial review of the Kansas City Board of Police Commissioners' decision to terminate his employment as a police officer with the Kansas

City Police Department. The Board [1] found that Schnell violated Department policies by failing to seek medical help for a sick arrestee who requested medical attention; by treating the arrestee in a discourteous, undignified, and derogatory manner; and by failing to recover the arrestee's counterfeit temporary license tag. The circuit court affirmed the Board's decision to terminate Schnell's employment, and Schnell appeals. On appeal, Schnell asserts that the Board failed to determine whether cause existed to terminate his employment and that the Board applied the wrong legal standard in terminating him. He also contends that cause did not exist to terminate him because: (1) he was not on fair notice of the Board's "expansive interpretation" of the Department's policy which required him to seek medical help for a sick person who requested medical attention, (2) he was not on fair notice of his obligation to recover the arrestee's counterfeit temporary license tag, (3) he was not rude to the arrestee, and (4) the Board failed to determine that termination was the appropriate degree of discipline in this case. We affirm.

On February 5, 2006, at 10:45 p.m., Schnell and his partner, Officer Melody Spencer,[2] were on patrol in the area of Ninth and Prospect in Kansas City. As part of a special project with the Department of Revenue, they were looking for vehicles with fake temporary license tags. When they saw an unoccupied car with no license tags parked outside of a liquor store, they pulled over and waited for the driver of the car to return. They watched as Sophia Salva came out of the liquor store, walked over to another car, and began talking to the occupants of that car. After talking for a while, Salva walked over to the unoccupied car. Salva got into the car, crawled into the back seat, and taped a temporary license tag in the back window. Salva then got into the driver's seat and pulled out of the parking lot.

Suspecting that Salva's temporary license tag was fake, Schnell and Spencer followed her and eventually stopped Salva's car at Ninth and Brooklyn. Schnell's and Spencer's patrol car was equipped with a video camera that was activated once Salva's car was stopped. The video camera recorded the events and conversations that occurred during the traffic stop.

Schnell got out of the patrol car and approached Salva's car. Schnell told Salva that she had been stopped because she had a fake temporary license tag in her back window. Within thirty seconds of Schnell's initiating this conversation, Salva told him, "I'm having [a] miscarriage."[3] Less than one minute into the stop, Salva told Schnell, "I have a problem. I am bleeding. I took this car, and I want to go to the hospital."

Schnell then asked Salva if she had a driving license. Salva said that she did not know where her license was. When Schnell asked Salva if she had any identifi-

---

**1.** The Board members were Karl Zobrist, Terry J. Brady, Mark C. Thompson, James B. Wilson, and Kansas City Mayor Mark Funkhouser.

**2.** The Board also terminated Spencer's employment with the Department. Spencer appeals from that decision, and we hand down that opinion simultaneously with this case.

*Spencer v. Zobrist,* 323 S.W.3d 391 (Mo.App. W.D.2010).

**3.** Schnell testified that he never heard Salva say that she was having a miscarriage. According to Schnell, Salva was "very difficult to understand largely because of her accent," and he had trouble hearing her anyway because of the traffic sounds and a radio earpiece that he was wearing.

cation, Salva replied, "Can the lady [referring to Spencer] check me? I'm bleeding. I have three month baby inside." Schnell responded, "Ok. Do you have a driver's license?" Schnell then summoned Spencer to Salva's car. Salva told both officers that she wanted to go to the emergency room.

Schnell told Spencer that Salva was "just giving me a long line of excuses, says she's bleeding. She says you can check." Schnell testified that he believed Salva was merely having "a female problem," specifically, her menstrual period. Salva reiterated that Spencer could check her. Schnell told Salva that Spencer was not a doctor. Schnell again asked Salva if she had identification with her, and Salva said that she did not. Schnell told Salva to exit her car, and she did. After Salva got out of her car, Schnell told Spencer that Salva claimed to be three months pregnant. Upon hearing this, Salva added, "I'm three months pregnant and I'm bleeding." [4]

During the next fourteen minutes of the stop, Salva asked to go to the hospital at least ten more times, told the officers that she was bleeding seven times, said she was pregnant at least two more times, and told the officers she had stomach pain one time. After one of Salva's requests to go to the hospital, Schnell told her, "You can go to the hospital when we're done with you, because you're obviously not telling us everything here." Schnell responded to one of Salva's attempts to tell the officers that she had a baby in her stomach and that she was bleeding by ordering her to stay seated or she would "go in handcuffs." Salva then asked Schnell, "If I die here you will take care of it? If I die here?" Schnell replied, "Fair enough." Five minutes later, Schnell asked Salva where she was from originally. After Salva said that she was from Sudan, Schnell said, "Sudan. If I was from Sudan and I did drugs, what kind of drugs would I do in Sudan? I'm just curious. Do you have drugs there? Do you do like cocaine?"

When Schnell and Spencer later obtained Salva's correct identifying information, they learned that she had several municipal warrants and that her driving license had been suspended. They placed Salva under arrest. The officers contacted dispatch and requested a transportation wagon to take Salva to Department headquarters. At no time did either Schnell or Spencer procure transportation for Salva to be taken to a hospital.

When the transportation wagon arrived at 11:12 p.m., Salva asked Schnell and Spencer if they could report her bleeding. Schnell responded, "Will do. When we take you to the station you'll be able to report all that. We'll get this stuff taken care of." Spencer added, "And they'll be able to give you a product to help you stop that," referring to the bleeding. Schnell then said, "Big product too no less." The transportation wagon took Salva to Department headquarters at approximately 11:20 p.m., where she was incarcerated.[5]

**4.** Schnell testified that he believed that Salva was lying about her medical condition because she did not appear to him to be in pain or discomfort or have any physical signs of a miscarriage, especially since he and Spencer had observed Salva at the liquor store climbing into the back seat of her car to affix the temporary tag to her back window. Because Salva was being nonresponsive and evasive in her answers to the officers' questions, Schnell believed that Salva had "jailitis." According to Schnell, "jailitis" is when an arrestee lies about having a medical condition to keep from going to jail.

**5.** According to Schnell, he believed that jail personnel would screen Salva for any medical issues upon intake. The Internal Affairs investigative file indicates that Salva told jail personnel that she was pregnant and bleeding. Indeed, jail personnel observed blood in the crotch area of Salva's pants and gave

While still incarcerated during the morning hours of February 6, 2006, Salva passed at least one blood clot, leaked blood and bodily fluid, and experienced abdominal cramping. Around 9:00 a.m., Salva was taken by ambulance to the hospital. Several hours later, she delivered a very premature baby that did not survive. Salva had been approximately fifteen weeks pregnant.

On February 5, 2007, the Board directed that Police Chief James Corwin conduct an Internal Affairs Unit investigation into the matter. After the investigation, Corwin recommended that Schnell's employment with the Department be terminated. On February 20, 2007, Corwin filed charges and specifications with the Board, alleging that Schnell: (1) violated Department Procedural Instruction 98–7 by failing to arrange for Salva to receive medical attention after she pleaded for it; (2) violated Department Personnel Policy 201–7 by making discourteous and undignified statements to Salva in a patronizing manner; and (3) violated Department Procedural Instruction 01–4 by failing to recover the counterfeit temporary license tag from Salva's car.

Schnell requested a hearing and, pursuant to a Board policy, elected that a hearing officer hear the matter.[6] Following a hearing, the hearing officer issued findings of fact and conclusions of law. The hearing officer concluded that Corwin failed to meet his burden of proof on all three of the charges against Schnell and, therefore, just cause did not exist to terminate Schnell's employment. The hearing officer recommended that Schnell be reinstated as a police officer, with full back pay and benefits.

The Board reviewed the evidence that was presented to the hearing officer and scheduled a hearing to receive additional evidence. In its subsequent findings of fact and conclusions of law, the Board determined that Corwin had met his burden of proof on the three charges and that Schnell's termination was the appropriate remedy. The Board terminated Schnell's employment with the Department.

Schnell filed a petition for judicial review of the Board's decision in the circuit court. The circuit court affirmed the Board's decision. Schnell appeals.

 On appeal from the circuit court's review of an agency's decision, we review the agency's actions and not those of the circuit court. *Albanna v. State Bd. of Registration for Healing Arts,* 293 S.W.3d 423, 428 (Mo. banc 2009). Our review is limited to determining whether the Board's decision was constitutional; was within the Board's statutory authority and jurisdiction; was supported by competent and substantial evidence upon the whole record; was authorized by law; was made upon lawful procedure with a fair trial; was not arbitrary, capricious or unreasonable; or was a proper exercise of discretion. *Lagud v. Kansas City Bd. of Police Comm'rs,* 136 S.W.3d 786, 791 (Mo. banc 2004); § 536.140.2, RSMo Cum.Supp. 2009. In reviewing the Board's decision, we must consider the entire record and not simply the evidence that supports the Board's decision. *Coffer v. Wasson–Hunt,* 281 S.W.3d 308, 310 (Mo. banc 2009). "If the evidence permits either of two opposing findings, deference is afforded to the administrative decision." *Id.* We, however, do not defer to the Board's decision on

---

Salva a pair of paper pants. Salva, however, was not provided any medical care until the next morning.

6. The hearing officer was the Honorable Jack E. Gant.

questions of law. *Vivona v. Zobrist,* 290 S.W.3d 167, 171 (Mo.App.2009).

In his first point, Schnell complains that the Board erred in terminating his employment because it failed to determine whether there was cause for termination. Section 84.600, RSMo 2000, governs the discharge, removal, and discipline of police officers in Kansas City. Schnell, a non-probationary police officer, was "subject to discharge or removal only for cause." [7] § 84.600. In its order terminating Schnell, the Board found that Schnell violated three Department policies and that termination of his employment was an appropriate remedy for his actions. Because, however, the Board did not expressly state that Schnell's actions in violating the policies constituted "cause" for termination, Schnell argues that the Board failed to determine whether there actually was cause.

Although section 84.600 does not define "for cause," the Missouri Supreme Court has defined the term as it is used in section 84.150, RSMo Cum.Supp.2009, an analogous statute governing the removal of police officers in St. Louis. In construing statutes, " 'it is appropriate to take into consideration statutes involving similar or related subject matter when such statutes shed light upon the meaning of the statute being construed[.]' " *State ex rel. Nixon v. Smith,* 280 S.W.3d 761, 767 (Mo.App.2009) (quoting *Citizens Elec. Corp. v. Dir. of Dep't of Revenue,* 766 S.W.2d 450, 452 (Mo. banc 1989)). This is because " '[w]hen the legislature enacts a statute referring to terms which have had other judicial or legislative meaning attached to them, the legislature is presumed to have acted with knowledge of that judicial or legislative action.' " *Id.* (quoting *Citizens Elec.*

*Corp.,* 766 S.W.2d at 452). Moreover, when a statute does not define a term but the term "has a recognized common law meaning, it will be understood that the General Assembly intended to employ that meaning." *Id.*

Like section 84.600, section 84.150 provides that police officers are "subject to removal only for cause." In *McCallister v. Priest,* 422 S.W.2d 650, 657 (Mo. banc 1968), the Missouri Supreme Court said that the term "for cause" "means legal cause." *Id.* Specifically, the cause " 'must be one which specially relates to and affects the administration of the office, and must be restricted to something of a substantial nature directly affecting the rights and interests of the public.' " *Id.* (citations omitted).

In its order, the Board made findings that clearly demonstrate how Schnell's policy violations related to and affected the administration of the office and were of a substantial nature directly affecting the rights and interests of the public. Specifically, the Board found:

45. Officer Schnell's decision not to seek medical attention for Ms. Salva demonstrates a dangerous lack of concern for public health and safety, and that Officer Schnell lacks the judgment necessary to appropriately interpret and apply Procedural Instruction 98–7.

. . . .

50. Officer Schnell's failure to recognize that his treatment of Ms. Salva was disrespectful reflects poor judgment as to the manner of conduct expected of an employee of the Department.

. . . .

53. Officer Schnell's actions of making a determination as to Ms. Salva's medical condition, refusing to call for

---

**7.** Termination for cause distinguishes certain types of employment from at will employment, which is presumed in most employee/employer relationships.

medical attention when requested, and treating Ms. Salva in an inconsiderate manner are prejudicial to the good order and discipline of the Department, bring discredit upon the Department, and adversely affect and undermine public respect and confidence in the Department.

These findings concerning Schnell's violations of Department policies by refusing to provide transportation to a sick arrestee and by treating the public in a discourteous and undignified manner articulate how Schnell's actions related to and affected the administration of the office and were of a substantial nature directly affecting the public's rights and interests. The findings fall squarely within the Missouri Supreme Court's definition of the cause necessary for discharging a police officer. That the Board did not use the specific word "cause" in its order is of no consequence.[8] By finding that Schnell (1) demonstrated a "dangerous lack of concern for public health and safety"; (2) lacked the judgment necessary to interpret and apply certain policies and to conduct himself properly as a Department employee; (3) brought discredit upon the Department; and (4) acted in such a manner that was "prejudicial to the good order and discipline of the Department" and that "adversely affect[ed] and undermine[d] public respect and confidence in the Department," the Board found that there was cause to terminate his employment. To hold otherwise would be to exalt form over substance. We deny Schnell's first point.

◼ In his second point, Schnell claims that the Board applied the wrong legal standard in terminating him. Chief Corwin was the moving party in this action and, therefore, bore the burden of proving that Schnell's employment should be terminated for cause. *Heidebur v. Parker*, 505 S.W.2d 440, 444 (Mo.App.1974). Corwin was required to prove his case by a preponderance of the evidence. *Fujita v. Jeffries*, 714 S.W.2d 202, 206 (Mo.App. 1986).

In its conclusions of law, the Board stated that Corwin met his burden of proof, but it did not specify what that burden was. Twice in the order, the Board stated that there was "competent and substantial evidence" to support its decision. Because of these statements, Schnell argues that the Board did not hold Corwin to the preponderance of the evidence standard but, instead, held him to the lesser competent and substantial evidence standard. We disagree. When the Board's order is considered in its entirety, it is clear that the Board held Corwin to the preponder-

---

**8.** To support his argument that the only way for the Board to demonstrate that it terminated him for cause was to make a finding using the express language "for cause," Schnell cites *Bodenhausen v. Missouri Board of Registration for Healing Arts*, 900 S.W.2d 621 (Mo. banc 1995), and *Bowen v. Missouri Department of Conservation*, 46 S.W.3d 1 (Mo.App. 2001). Neither case stands for such a proposition. In *Bodenhausen*, the Board of Registration for the Healing Arts asserted that it could discipline a physician without ever filing a complaint with the Administrative Hearing Commission. 900 S.W.2d at 622–23. The Missouri Supreme Court disagreed, ruling that, before the Board could discipline a physician, the Board had to file a complaint with the Commission and the Commission had to find cause for discipline in its written findings of fact and conclusions of law. *Id.* The Court did not address what language the Commission had to include in its order indicating that it found cause. Similarly, in *Bowen*, we held that the Department of Conservation had to determine whether terminating a non-merit employee was "not for the good of the service," but we did not address what language the Department had to include in its order indicating that it made this determination. 46 S.W.3d at 10–11. Thus, the issue in *Bodenhausen* and *Bowen* was not the wording of the agencies' statutorily-required determinations but the agencies' failure to make those determinations at all.

ance of the evidence standard of proof and that its references to there being competent and substantial evidence to support its decision were merely superfluous.[9]

■ Initially, we note that the two standards differ in function, definition, and application. Preponderance of the evidence is a standard of proof, that is, "[t]he degree or level of proof demanded in a specific case." BLACK'S LAW DICTIONARY 1535 (9th ed.2009). "Preponderance of the evidence is that which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not." *Fujita*, 714 S.W.2d at 206.

■ The competent and substantial evidence standard is not a standard of proof but, rather, is a standard of judicial review of an administrative agency's decision pursuant to section 536.140.2, RSMo Cum. Supp.2009.[10] *Tate v. Dep't of Soc. Servs.*, 18 S.W.3d 3, 7–8 (Mo.App.2000). Substantial evidence, which necessarily implies competent evidence, means:

> "[E]vidence which, if true, has probative force upon the issues, i.e., evidence favoring facts which are such that reasonable men may differ as to whether it establishes them; it is evidence from which the trier or triers of the fact reasonably could find the issues in harmony therewith; it is evidence of a character sufficiently substantial to warrant the trier of facts in finding from it the

facts, to establish which the evidence was introduced."
*Fujita*, 714 S.W.2d at 206 (quoting *Collins v. Div. of Welfare*, 364 Mo. 1032, 270 S.W.2d 817, 820 (1954)).

■ Both parties to a contested matter can present substantial evidence. *Id.* Indeed, when a court reviews the record to determine if an agency's decision is supported by competent and substantial evidence, it may also find that there is competent and substantial evidence in the record to support a contrary decision. *See Lagud*, 136 S.W.3d at 791 n. 5.[11] In contrast, only one party can meet the preponderance of the evidence standard. *Fujita*, 714 S.W.2d at 206. This is because, unlike in determining whether competent and substantial evidence supports an agency's decision, in determining whether the preponderance of the evidence supports a party's position, the trier of fact must resolve conflicting evidence and decide "which of the parties' positions [is] more probable, more credible and of greater weight." *Id.*

The trier of fact in this case—the Board—did exactly that. Corwin presented evidence establishing that Schnell's decision not to call an ambulance for Salva was unreasonable under the totality of the circumstances, that it was the practice of the Department and Schnell's division to recover counterfeit temporary license tags, and that Schnell spoke to and treated Salva in a disrespectful, undignified, and derogatory manner. Schnell then presented evidence to refute the charges against him. He offered evidence that his decision not to call an ambulance for Salva was reason-

9. Perhaps, because this court reviews the Board's decision to assure that it is supported by substantial and competent evidence, the Board was attempting to persuade us that, at least in its opinion, such evidence existed.

10. Section 536.140.2(3) provides that, in reviewing an agency's decision, circuit and ap-

pellate courts determine whether or not the decision is supported by competent and substantial evidence on the whole record.

11. In such circumstances, the court is to affirm the agency's decision. *Lagud*, 136 S.W.3d at 791 n. 5.

able under the totality of the circumstances; that the practice in his division of the Department was not to recover counterfeit temporary license tags; and that his comments to Salva were innocuous. The Board's findings of fact and conclusions of law clearly show that it resolved the conflicts in the evidence against Schnell and determined that Corwin's position was more probable, credible, and of greater weight or more convincing than Schnell's position. Thus, the Board applied the correct preponderance of the evidence standard of proof. The Board's determination that there was competent and substantial evidence to support its decision was superfluous, as that was a determination for a reviewing court to make.[12] We deny Schnell's second point.

In his third point, Schnell claims that cause did not exist to terminate him because (1) he was not on fair notice of the Board's "expansive interpretation" of the Department's policy requiring him to seek medical help for a sick person who requested medical attention, (2) he was not on fair notice of his obligation to recover the counterfeit temporary license tag, (3) he was not rude to Salva, and (4) the Board failed to determine that termination was the appropriate degree of discipline in this case. We disagree.

The Board found that Schnell violated Department Procedural Instruction 98–7, entitled "Ambulance Calls and Arrests Taken to Hospitals." This policy states: "Officers will procure transportation for a sick or injured person when requested or appropriate." The plain language of the policy does not give an officer any discretion in procuring transportation for a sick person when requested.

Schnell does not assert that he was unaware of this policy; rather, he contends that he did not have notice of the Board's "expansive interpretation" of the policy. The Board found that Schnell was "on fair notice that calling an ambulance is the Department's policy when an arrestee requests medical attention and when it is not clear, based on factors plainly visible to the officer, that medical attention is not needed." Schnell contends that he was not on "fair notice" of the uncommunicated policy requirements imposed by this "expansive interpretation."

Chief Corwin, who has twenty-eight years of experience with the Department, testified that an officer has "very little" to "basically no" discretion when deciding to call for transportation when a sick or injured person requests medical attention.[13] Corwin said that, pursuant to the policy, if someone asks for an ambulance, the officer must provide one. He said that the only time an officer would not be required to call for an ambulance is if someone said that his hands had been cut off but the officer could see that his hands were still

---

**12.** We acknowledge that, in *Fujita,* this court's Eastern District did not examine the entirety of the order to determine if the agency actually applied the preponderance of the evidence standard. 714 S.W.2d at 206. In *Fujita,* however, the administrative agency specifically referred to the competent and substantial evidence standard as the standard of proof, as it stated in its order that the non-prevailing party "did not establish by competent and substantial evidence" the required allegations. *Id.* at 207. Moreover, because the agency's adoption of the competent and substantial evidence standard actually benefited the appellant, the court's inquiry ended there. *Id.* at 206. That is not the case here.

**13.** At the hearing before the Board, Corwin acknowledged that all procedural instructions of the Department carry with them the obligation to carry out the policies exercising sound discretion, but he noted that Procedural Instruction 98–7 requires an officer to provide an ambulance to a person who requests one.

attached. Corwin said that police officers have very little medical training and, therefore, they should not make medical decisions or determine whether medical attention is actually needed. Thus, according to Corwin, if someone requests medical aid and the officer cannot see the problem, the officer is required to procure transportation.

Major Laura Barton agreed with Corwin that an officer has "very, very limited" discretion in deciding to call for transportation when a sick or injured person requests medical attention. Barton said that the traditional past practice for the twenty-eight years that she has been with the Department is that the policy required an officer to call for an ambulance for a person who requested it. She stated that, in her experience, this is the policy even for persons who are really not sick or injured. Like Corwin, Barton said that the only exception to the policy is where the claim of sickness or illness is "totally absurd." Barton said that, because officers are not medical professionals, they are not qualified to make decisions about whether a person needs medical attention.

Deputy Chief Rachel Whipple, who also has twenty-eight years of experience with the Department, testified that the policy obligates an officer to call for an ambulance when a person requests medical attention. She said that the only exception to this requirement is if somebody said "that they have what would be an obvious injury, like their hand being cut off and their hand is still firmly attached." Whipple said, however, that "anything less than that there is no discretion because we are not medical professionals and many serious illnesses don't manifest any outward signs."

The Board concluded that it is the Department's policy to call for an ambulance when an arrestee requests medical attention and "when it is not clear, based on factors plainly visible to the officer, that medical attention is not needed." Schnell's point on appeal is that he was not on fair notice of his obligations under this "expansive interpretation." But, Corwin's, Barton's, and Whipple's testimony demonstrates that it has been the custom and practice of the Department for each of their twenty-eight years of service for an officer to call for an ambulance when a person says that he or she has a medical issue. It is reasonable to infer that, since it was the custom and practice of the Department for twenty-eight years to call an ambulance when an arrestee requests medical attention, Schnell had fair notice of this policy. Corwin's, Barton's, and Whipple's opinion that an officer may not have to call an ambulance in a situation which is so obvious to the officer that the person does not need medical attention, e.g., a person says that his hands were cut off and the officer sees that his hands are firmly attached, is not an expansive interpretation of the policy requiring additional notice to officers. Rather, it is an interpretation based upon common sense and an interpretation that does not render the Department's policy absurd. This exception and the Board's finding based upon this exception merely show a circumstance in which the policy would not apply. Such circumstances were not even present in this case.

That Schnell allegedly did not know of the Board's "expansive interpretation" of the policy does not aid his argument that he had discretion to determine whether or not he needed to procure transportation for Salva under the circumstances in this case. Schnell admits that he was aware of the Department's policy requiring him to call for an ambulance when a sick or injured person requests medical help. Schnell's interpretation of the policy—that

he was allowed to determine whether the person was sick or injured before calling for an ambulance—undermines the very purpose of the Department's policy. The purpose of the policy is to require officers to procure transportation for a sick or injured person when requested so that the officers do not have to make the determination whether medical attention is needed. Under the policy, Schnell had to procure transportation for Salva once Salva requested it. Substantial and competent evidence supports the Board's decision that Schnell was on fair notice of the Department's policy.

 Schnell next claims that the Board could not rely upon his violation of the Department's policy requiring him to recover Salva's counterfeit temporary license tag as cause for his termination because he was not on fair notice of his obligation to recover the tag. Department Procedural Instruction 01–4 provides that, when an officer encounters a motor vehicle with altered or counterfeit license plates or temporary permits, "[t]he altered or counterfeit plate(s)/temporary permit will be recovered and forwarded to the Property and Evidence Section, to be held as evidence."

Schnell does not dispute that he was aware that this policy required him to recover Salva's counterfeit tag. Instead, Schnell argues that he was told by "supervisors" that recovery of a counterfeit temporary license tag was not required because the tag was not needed to secure a conviction. He contends that his testimony to this effect was undisputed. Because the Board did not issue a finding that this testimony was incredible or unworthy of belief, Schnell argues that the Board could not disregard it.

 It is true that an administrative agency cannot disregard unimpeached or undisputed testimony unless the agency makes a specific finding that such testimony is not credible or not worthy of belief. *Lagud v. Kansas City Bd. of Police Comm'rs*, 272 S.W.3d 285, 292 (Mo.App. 2008). Contrary to Schnell's claim, however, his testimony was disputed. Barton was the Division Commander of the East Patrol Division, which was Schnell's division. Although Barton was not assigned the position of Division Commander until after the incident involving Salva occurred, Barton testified that, in the counterfeit temporary license tag cases that she was aware of in her twenty-eight years of experience with the Department, the officers recovered the counterfeit tags. She further testified that she was not aware of anyone at East Patrol Division telling officers that they did not need to recover the counterfeit tags.

Additionally, Captain Mark Heimer and Sergeant Michael Seward, who were also in Schnell's chain of command in the East Patrol Division, found that Schnell violated the policy by failing to recover the counterfeit tag. The Board could reasonably infer that, if Schnell were not required to recover the counterfeit tag, Heimer and Seward would not have found that Schnell violated the policy. Schnell's contention that he was denied fair notice of his obligation to recover Salva's counterfeit tag is without merit. The Board properly relied upon Schnell's violation of this policy as cause for his termination.

 Schnell next claims that there was not cause to terminate him because the Board's determination that he was rude to Salva lacked evidentiary support. In its order, the Board found that Schnell "spoke to and about Ms. Salva in a disrespectful manner" and that Schnell's treatment of Salva was discourteous, undignified, and derogatory. In particular, the Board found to be disrespectful (1) Schnell's tell-

ing Spencer that Salva's references to her bleeding were just "a long line of excuses," (2) his responding to Salva's question, "If I die here you will take care of it?" by saying, "Fair enough," (3) his asking Salva what kinds of drugs she did in Sudan, and (4) Schnell's indicating that the feminine hygiene product Salva would be provided with in the detention facility would be a "[b]ig product too no less." The Board concluded that Schnell's statements to and treatment of Salva violated Department Personnel Policy 201–7, which required that officers treat the public with courtesy, consideration, and dignity. Schnell contends that his remarks to Salva were not derogatory or discourteous. He argues that he did not intend to be rude to her. To support his argument, he relies upon his testimony offering innocuous interpretations of his statements.[14]

The Board, however, watched the videotape of the stop and, therefore, could judge Schnell's demeanor and the context in which Schnell made these remarks. The Board also heard testimony and statements from officers in Schnell's chain of command who opined, based upon their experience in the Department, that Schnell was discourteous to Salva.[15] The Board had substantial evidence to support its decision that Schnell spoke to and treated Salva disrespectfully and, in doing so, violated Department Personnel Policy 201–7. Although Schnell presented evidence that would have supported a contrary decision, we defer to the Board's findings. *Coffer*, 281 S.W.3d at 310.

Finally, Schnell contends that cause did not exist to terminate him because the Board failed to determine that termination was the appropriate degree of discipline in this case. In particular, he contends that because the Board determined that termination was "*an* appropriate remedy"—instead of *the* appropriate remedy—the finding was insufficient. The result of the Board's decision in this case was termination of Schnell's employment. The Board, therefore, determined that termination was the appropriate remedy for Schnell's policy violations in this case.

Schnell contends that, even if we determine that the Board's finding was sufficient, we should reverse because the finding of termination lacks evidentiary support. In particular, Schnell points to evidence that two of the officers in his chain of command did not recommend termination and that, because Schnell had never been disciplined by the Department and had received numerous commendations,[16] the Department should have followed progressive discipline.[17]

---

14. According to Schnell, when he said, "Fair enough," in response to Salva's asking whether he would take care of it if she died at the scene, he did not believe that she was in mortal danger. He testified that he meant "okay or whatever, sure, will do." Schnell testified that his purpose for asking Salva questions about drugs done in Sudan was to gather "intel" in case he might be "running into more Sudanese natives." Finally, Schnell testified that he made the comment, "Big product too no less," to himself and that it was not a comment about Salva's size but a comment about the size of the feminine hygiene products offered at the detention facility.

15. We presume that these witnesses also had the benefit of viewing the videotape.

16. The record establishes that Schnell had received more than twenty commendations for his service with the Department and that, prior to this incident, he had never been disciplined by the Department.

17. In Schnell's brief, he also asserts that, if we find that he committed only one out of the three alleged policy violations, any one of these violations, standing alone, would be insufficient to impose termination. We need not address this contention because competent and substantial evidence existed establishing that Schnell violated all three policies.

The statutes governing the Board do not, however, require the Board to follow recommendations of the chain of command or to follow progressive discipline. Section 84.600 provides that the Board may remove, suspend, reprimand, or impose a fine upon the officer for violations of Department rules and regulations. Section 84.600 further provides that "[e]ach decision of the police board in such cases shall be final[.]" In addition, although the police chief disciplines the officers, section 84.610, RSMo 2000, gives the Board on review of the chief's decision "the power ... to affirm, modify or reverse such action of the chief and may make such other orders as the board may deem necessary." Section 84.610 also states that "[e]ach decision of the police board in such cases shall be final." Moreover, pursuant to section 84.460, RSMo 2000, the Board has exclusive power to manage and control the police force.

Thus, it was within the Board's discretion to terminate Schnell for violating the Department policies by failing to seek medical help for Salva when she requested medical attention, by failing to recover the counterfeit temporary license tag, and by treating Salva in a discourteous and undignified manner. We will not substitute our judgment for the Board's in the absence of an abuse of that discretion. *See Vivona*, 290 S.W.3d at 174. We find no such abuse of discretion in this case. We deny Schnell's third point.

Competent and substantial evidence supported the Board's decision that cause existed to terminate Schnell's employment with the Department due to Schnell's failing to seek medical help for Salva, his failing to recover the counterfeit temporary license tag, and his treating Salva in a discourteous and undignified manner. The Board's decision was not arbitrary, capri-

cious, or unreasonable. We, therefore, affirm the Board's decision terminating Schnell's employment with the Department.

All concur.