**William R. TURNER, Respondent,**

v.

**Gil COPLEY, Director of the St. Charles County Department of Community Health and Environment, and The Merit System Commission of St. Charles County, and St. Charles County, Missouri, Appellants.**

No. WD 73204.

Missouri Court of Appeals, Western District.

Oct. 4, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 1, 2011.

tained in Rule 24.035(b) by failing to raise

that issue in the motion court).

Harold A. Ellis, for Appellants.

Brian D. Klar, for Respondent.

Jonathan Maire, Co-counsel for Respondent.

Before Division Three: VICTOR C. HOWARD, Presiding Judge, ALOK AHUJA, Judge and KAREN KING MITCHELL, Judge.

VICTOR C. HOWARD, Judge.

Gil Copley and St. Charles County appeal the circuit court's judgment reversing the decision of the Merit System Commission of St. Charles County upholding the termination of William Turner's employment with the County. The circuit court's judgment is reversed, and the case is remanded with instructions to reinstate the Commission's decision.

## Background

In July 2008, William Turner was hired by St. Charles County as a Regional Response Planner within the Department of Community Health and Environment's ("Health Department") Office of Emergency Preparedness and Epidemiology ("Office"). The Office plans emergency responses to two types of health emergencies: bio-terrorism and emerging infections. Bio-terrorism planning involves responses to intentionally inflicted harm on the general population and the direct distribution of antibiotics held by the Strategic National Stockpile to the general population, within 48 hours and through designated Points of Distribution, subject to stringent federal regulations including security and confidential planning requirements. Emerging infections planning addresses new and previously unknown illnesses and pandemics such as monkey pox or bird flu, is typically looser than bio-terrorism planning, and is not subject to stringent federal regulations that govern bio-terrorism planning and the distribution of antibiotics. The Office is funded through a contract between the County and the State of Missouri, which covers both bio-terrorism and emerging infections planning as well as epidemiology and further commits the County to participate in a Cities Readiness Initiative ("CRI"). The CRI expands local bio-terrorism planning to a regional level, in this case the St. Louis CRI Region consisting of the City of St. Louis, the Missouri counties of St. Louis, St. Charles, Crawford, Franklin, Jefferson, Lincoln, Warren, Washington, and several Illinois counties. As Regional Response Planner, Mr. Turner was responsible for managing and coordinating the CRI program for the St. Louis CRI Region. His job duties also included emerging infections planning and "other duties as assigned." Mr. Turner worked under the guidance of Senior Regional Response Planner, Hope Woodson, who headed the Office.

In 2006 and 2007, Ms. Woodson and other planners and responders drafted a

Pandemic Influenza Emergency Response Plan 2007 ("Pandemic Plan"). The Pandemic Plan was part of the Office's emerging infections planning and was prepared in response to an outbreak of bird flu. After federal funding ceased, work on the "Pandemic Plan" ceased, and the document was never made final. The Office, however, continues to use and update the "Pandemic Plan."

During the week of April 20, 2009, the Office began to monitor an outbreak of flu-like (swine flu) symptoms in Canada, Mexico, and California. By April 26, 2009, the Centers for Disease Control had declared a national public health emergency. To manage the response to the emergency, the Health Department's Director, Gil Copley, established an Incident Command team with himself as Incident Commander. On April 28, 2009, the Office received notice from the State that it would release a cache of anti-viral medications, leaving to the discretion of local public health authorities any decision on the distribution of the medications.

The Office began planning for receipt and distribution of the medications with twice-daily staff meetings. Because distribution of anti-viral medications was not in response to a bio-terrorism event, the operation was not governed by bio-terrorism plans such as under the CRI but rather the Office's "Pandemic Plan," specifically its Appendix J, was useful by providing the groundwork. With respect to distribution to healthcare institutions, Appendix J provided for ordering and pick up of medications by the institutions, and those provision were successfully followed on May 1, 2009. With respect to distribution to pharmacies, Appendix J reserved the development of detailed procedures for later planning. The Office made such plans for distribution to the pharmacies in the County during the week of April 27. Mr. Tur-

ner attended the Office's twice-daily planning meetings except for the two meetings on April 30 when he had to stay home to attend to a malfunctioning water well.

On the morning of May 1, 2009, Ms. Woodson decided that County staff would deliver the anti-viral medications to pharmacies rather than hold them for pick-up, and her decision was authorized by Mr. Copley. The delivery team selected by Ms. Woodson consisted of three people: Mary Neeley, a registered nurse to answer any questions about the medications; Kelly Bobeen to drive the delivery truck; and Mr. Turner, who was assigned the task of "logistics leader" on the team. As logistics leader, Mr. Turner was charged with navigating and giving directions to the driver, calling pharmacies in advance to arrange for delivery, staying in contact with Incident Command, and managing unforeseen problems to ensure completion of the deliveries.

The delivery team used an F–350 truck that towed a small locked trailer containing the medications. The Sheriff's Office provided security for the delivery team in a separate vehicle although security was not required. The team delivered medications to pharmacies until approximately 8 p.m. that evening. Mr. Copley decided to end the operation at that time after receiving a phone call from a captain at the Sheriff's Office requesting Mr. Turner's removal from the delivery team and because it was getting late and pharmacies would soon close. Ms. Woodson picked up Ms. Bobeen and Ms. Neely at a drug store and drove them back to the Health Department, while Mr. Turner drove the delivery truck without security escort to the sheriff's facility to store it. After the women returned to the Health Department, Ms. Woodson and Mr. Copley debriefed Ms. Bobeen and Ms. Neeley about the delivery operation. The women stated

that Mr. Turner had not been helpful and asked that he not accompany them on the remaining deliveries the next day. Mr. Copley decided that evening to remove Mr. Turner from the delivery team for the next day.

On May 4, 2009, Mr. Copley and Ms. Woodson took disciplinary action against Mr. Turner in the form of verbal counseling and written reprimand addressing his conduct during the delivery operation. Mr. Turner prepared a written rebuttal to reprimand and gave it to Ms. Woodson the next day. Mr. Copley again debriefed Ms. Bobeen and Ms. Neely on May 5, gathering additional information from them about jokes Mr. Turner played on Ms. Bobeen during the delivery operation. He also collected written statements from the women about the delivery operation.

On May 20, 2009, Mr. Copley notified Mr. Turner in writing that the Health Department was considering severe disciplinary action and that a pre-disciplinary hearing would be held. At the hearing, which was held on May 28, Mr. Turner did not respond in full detail to the notice of disciplinary action, expressing his concerns that the decision had already been made. He, however, agreed that Mr. Copley could consider his written rebuttal as responsive to the notice.

Mr. Copley terminated Mr. Turner's employment with the County effective June 4, 2009. Mr. Turner appealed his dismissal to the Merit System Commission of St. Charles County. A hearing was held on September 15, 2009. The County presented the testimony of Ms. Woodson, Ms. Bobeen, Mr. Copley, and one of the sheriff's deputies from the delivery team. Mr. Turner testified on his own behalf. On December 16, 2009, the Commission issued its final decision sustaining Mr. Copley's dismissal of Mr. Turner based on abuse of a fellow employee, unsatisfactory perform-

ance of his duties, and conduct prejudicial to the County.

Mr. Turner sought judicial review of the Commission's decision, and the circuit court reversed Mr. Copley's decision to terminate Mr. Turner's employment and the decision of the Commission affirming the termination, ordered Mr. Turner's reinstatement to his previous position, and awarded him back pay retroactive to June 4, 2009. This appeal followed.

### Standard of Review

■ Article V, Section 18 of the Missouri Constitution authorizes judicial review of administrative actions. Reviewing courts determine whether the agency actions "are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." *Id.* An appellate court reviews the agency's decision rather than the trial court's decision. *Albanna v. State Bd. of Registration for Healing Arts*, 293 S.W.3d 423, 428 (Mo. banc.2009).

■ The standard of review for administrative decisions is "whether, considering the whole record, there is sufficient competent and substantial evidence to support the [agency's decision.]" *Albanna*, 293 S.W.3d at 428 (internal quotes and citation omitted). The evidence is not viewed in the light most favorable to the agency's decision. *Id.*; *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003). A decision "that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Hampton* 121 S.W.3d at 223. The reviewing court defers to the agency's determinations regarding credibility and the weight to be given to the evidence. *George v. Civil Serv. Comm'n of City of St. Louis*,

318 S.W.3d 266, 269 (Mo.App. E.D.2010). Where the agency's decision involves a question of law, the court reviews it *de novo*. § 536.140.3; *Albanna*, 293 S.W.3d at 428.

Mr. Turner raises thirteen points on appeal challenging the Commission's decision upholding his termination. The points are not necessarily discussed in the order presented, and many are discussed together.

### Grounds for Termination

In several points, Mr. Turner asserts that the Commission's conclusions that Mr. Copley was authorized and had grounds to terminate his employment were not supported by substantial and competent evidence and, even if supported by evidence, his conduct did not constitute cause for termination of his employment.

"It is the policy of St. Charles County to utilize a progressive disciplinary approach to address behavior and performance problems." § 115.460.A, Ordinances of St. Charles County, Missouri ("OSCCMo"). This approach contemplates the "imposition of increasingly severe disciplinary procedures when behavior or performance problems persist" with possible disciplinary actions including oral counseling or retraining, written reprimand, suspension, reduction in pay, demotion, and dismissal. *Id.* Under progressive discipline, "[t]he number and sequence of disciplinary actions taken prior to dismissal or demotion shall be tempered by the nature of the problem and the employee's prior disciplinary and performance record." *Id.*

Exceptions to progressive discipline exist:

Some inappropriate behavior or unacceptable performance is so disruptive, unsafe, or prejudicial to the County, that immediate and severe disciplinary action may be warranted without the use of progressive discipline.

§ 115.460.B, OSCCMo. Section 115.460.B includes a list of examples of such inappropriate behavior or unacceptable performance warranting immediate severe discipline, but the list is non-exclusive. One such exception to progressive discipline is "[p]hysical or verbal abuse of a supervisor, fellow employee, or citizen." § 115.460.B.1, OSCCMo.

Under section 115.460.E.2, OSCCMo, severe disciplinary action may also be taken after pre-disciplinary investigation and review for the following reasons:

(1) The employee is unwilling or unable to perform the duties or their position in a satisfactory manner; or

(2) The employee has committed an act or acts prejudicial to the County service; or

. . .

(4) The employee has rendered service that is below satisfactory standards or has otherwise become subject to disciplinary or other corrective measures.

§ 115.460.E.2.b(1), (2), and (4), OSCCMo.

The Commission concluded that Mr. Copley was authorized to terminate Mr. Turner's employment for several reasons. First, it found that Mr. Turner's conduct during the May 1, 2009 delivery operation amounted to abuse of a fellow employee under section 115.460.B.1 in that:

knowing Kelly Bobeen's concerns not to arouse any feelings of jealousy in her husband, [Mr. Turner] joked and teased her about her dealings with male members of the Delivery Team that evening, and staged a mock argument with his own spouse about working late on May 1, 2009, that mimicked Ms. Bobeen's conversation with her husband earlier that evening.

Next, the Commission found that Mr. Turner's conduct during the operation

amounted to unsatisfactory performance of his duties and service below satisfactory standards under sections 115.460.E.2.b(1) and (4) in that:

A. [Mr. Turner] persistently asked his fellow employees rhetorical questions challenging the wisdom of the delivery operation that evening (where are we, what are we doing, where are we going) and expressing resentment that he was on the delivery team;

B. [Mr. Turner] did not assist his fellow employees on the delivery team, except to carry some boxes from the locked trailer to the truck's cabin a few times towards the end of the operation;

C. [Mr. Turner's] conduct towards his female colleagues was unprofessional and its effect upon them was unsettling thereby affecting the continued ability of his female colleagues to work with [Mr. Turner];

D. Once an effective delivery alternative was established by other members of the Delivery Team and the Sheriff's deputies, [Mr. Turner] abrogated his duties as logistic leader and failed to inform Incident Command of that change;

E. [Mr. Turner's] failures during the delivery operation on May 1, 2009, or before or after it, to understand the County's pandemic flu plan and its differences from bio-terrorism planning evidences a persistent failure to take initiative and learn what the Office of Emergency Preparedness does and has done and to recognize the different legal and regulatory frameworks that govern bio-terrorism planning and response, on the one hand, and emerging-infection planning and response, on the other; and

F. [Mr. Turner's] conduct during the delivery operation on May 1, 2009, demonstrates that he can not be trusted and relied on in emergency operations for he did not follow orders and annoyed fellow employees who were involved in the operations.

Finally, the Commission found that Mr. Copley was authorized and had grounds to terminate Mr. Turner because his conduct after the delivery operation was prejudicial to the County under section 115.460.-E.2.b(2). Specifically, it found:

[Mr. Turner's] efforts to open discussions with officials of the State—even if unsuccessful—not only threaten and are meant to threaten the County's contractual and working relations with State health officials, but also demonstrate [Mr. Turner's] untrustworthiness as a County employee.

■ Review of the whole record reveals that the Commission's conclusions were supported by substantial and competent evidence and constituted sufficient grounds to justify the severe disciplinary action of termination of Mr. Turner's employment under the St. Charles County ordinances. The following evidence was presented regarding Mr. Turner's inappropriate conduct and unsatisfactory performance during and after the delivery operation. First, Mr. Turner failed to assist the other members of the team during the operation. Ms. Neeley and Ms. Bobeen, with the assistance of the deputies, carried the medications into the pharmacies during the operation. Mr. Turner never carried or offered to carry the medications into the pharmacies, and he assisted in transferring boxes of medications from the locked trailer to the truck's cabin only a few times towards the end of the evening. Mr. Turner testified that no one ever complained to him that he was not assisting nor was he asked to assist. He further testified he was never specifically told by anyone what his duties were during the delivery operation. He argues that the

record reveals only vague generalities about what Ms. Woodson told the delivery team or about what her expectations were regarding Mr. Turner's role on the team. He points to Ms. Woodson's testimony that there was "a lot of chaos" during the planning that morning. The record reveals, however, that although the details of the delivery operation were not finalized until early afternoon, Mr. Copley informed Mr. Turner that morning that he was to assist later in the day with the delivery of the medications to pharmacies. Mr. Turner worked at Incident Command that day and was present as the Incident Command team worked out the details of the operation. As the plans were developed throughout the day, they were repeatedly talked about and "gone over until everybody had a clear picture of what was going on" according to Ms. Woodson's testimony. Before beginning the delivery operation, Ms. Woodson met with Ms. Neeley, Ms. Bobeen, and Mr. Turner. She gave them a map and itinerary prepared by the Office and "went over everything" before they left.

Mr. Turner also failed to perform his logistics duties. Once the operation was underway, the map and itinerary proved to be confusing and inadequate to use, and Mr. Turner called Incident Command to report the difficulties the team was having with the materials. Incident Command explained how to use the map and itinerary, and Mr. Turner stated that he understood. He again confirmed that he understood how to use the materials when Ms. Woodson called him back five minutes later. The map and itinerary, however, also caused considerable backtracking, and the sheriff's deputies, who were familiar with the pharmacy addresses, took over and handled navigation for the rest of the evening. Although Mr. Turner testified at the hearing that he reported to Ms. Woodson this change and that she voiced no objections, Ms. Woodson testified that Mr. Turner made no more calls to Incident Command to report routing problems or to report that the deputies had taken over navigation.

Mr. Turner's conduct during the operation also proved to be distracting to the other members of the team. He complained continuously during the operation that the operation was a waste of man hours, that there had to be a better way to accomplish the goal, that he didn't understand why the team was out making deliveries, and that pharmacies could pick up their medications. He continually asked the other members of the team where are we, what are we doing, where are we going next and added that he hoped to be done that evening because he wanted to go turkey hunting the next morning. These complaints and questions were plainly intended to call into question the decision of more senior personnel as to the best manner to deliver the medications to the pharmacies. Mr. Turner also criticized Ms. Bobeen's driving throughout the operation and complained about the music selection. He was also sarcastic and joking during most of the operation, so much that Ms. Bobeen was never sure when he was being serious or when he was joking about duties. For example, at one point Mr. Turner told the women that they did not have to deliver to a particular Wal-Mart pharmacy but never specified which one. At another time, Ms. Neeley realized she had forgotten to leave a patient information sheet with one of the Schnucks pharmacies and asked Mr. Turner to have Ms. Woodson fax a copy to the pharmacy. Mr. Turner joked that it already had a copy, and Ms. Neeley asked him three times to call Ms. Woodson. The women weren't sure if he ever contacted Ms. Woodson about the information sheet, and they finally just began ignoring him.

Mr. Turner also joked inappropriately with Ms. Bobeen. Early in the operation, Mr. Turner observed Ms. Bobeen speaking on her mobile phone with her husband to explain why she had to work late that evening. Ms. Bobeen explained to Mr. Turner and Ms. Neeley that her husband was very jealous and checked up on her all the time, even following her on occasion. Mr. Turner played a joke on Ms. Bobeen, picking up her phone and pretending to have an argument or discussion with his own spouse. He also joked with her, asking what her husband would think about her having a sheriff's deputy's phone number in her mobile phone or being alone with him in the delivery truck that evening. He asked Ms. Bobeen if her husband would approve of her behavior with the deputies and wondered how the women's husbands would react if they called out another man's name while sleeping.

Mr. Turner argues that his joking was harmless and just part of the "playful banter" that was present during the operation. He testified at the hearing that there was considerable social interaction between the women and the deputies and that the women were listening and singing to the radio. In her written statement to Mr. Copley, Ms. Bobeen acknowledged that after Mr. Turner's inappropriate joking, the other members of the delivery team began ignoring Mr. Turner, joking with one another and playing music. Mr. Copley testified that the women were upset when he met with them about Mr. Turner's conduct during the delivery operation. He said Ms. Neely was angry and Ms. Bobeen cried and that they asked that Mr. Turner not accompany them the next day to finish the deliveries.

Finally, evidence was presented that Mr. Turner told Mr. Copley during Mr. Turner's pre-disciplinary review hearing that he had contacted the State about moving the CRI contract that funds his position to another jurisdiction. Mr. Copley replied that the contract was between St. Charles County and the State, not Mr. Turner and the State, and that Mr. Turner was an employee of St. Charles County. In the June 3 termination letter, Mr. Copley emphasized that Mr. Turner's unauthorized contact with the County's funding source threatened the County's contractual relationship with the State and was prejudicial to the County.

The Commission's findings regarding Mr. Turner's conduct during and after the delivery operation were supported by substantial and competent evidence. While Mr. Turner presented evidence that might have supported a contrary decision, this court must defer to the Commission's findings. *Spencer v. Zobrist*, 323 S.W.3d 391, 402 (Mo.App. W.D.2010); *George*, 318 S.W.3d at 269. "The determination of the Commission on conflicting facts is conclusive." *Cotton v. Flik Int'l Corp.*, 213 S.W.3d 189, 193 (Mo.App. E.D.2007).

 Furthermore, given the facts in this case, Mr. Turner's inappropriate conduct and unsatisfactory performance constituted sufficient grounds to justify the severe disciplinary action of termination of his employment as an exception to progressive discipline under the St. Charles County ordinances. The reviewing court's primary concern is the correctness of the result reached by the administrative agency and not the route taken to reach it. *Braddock v. Mo. Dep't of Mental Health*, 200 S.W.3d 78, 80 (Mo.App. W.D.2006). An agency's decision may be affirmed even if a wrong or insufficient reason is given for the ruling. *Cotton*, 213 S.W.3d at 193. In such situations, the decision may be affirmed if the reviewing court could reach the same result based on the same evidence without weighing the evidence or assessing credibility. *Id.* Here, the Com-

mission found that Mr. Turner's conduct towards Ms. Bobeen amounted to abuse of a fellow employee justifying an exception to progressive discipline. The ordinance provides, however, that the listed examples of conduct justifying immediate severe discipline are merely that—examples. The over-arching test under section 115.460.B remained whether Mr. Turner's conduct was "so disruptive, unsafe, or prejudicial to the County, that immediate and severe disciplinary action may be warranted without the use of progressive discipline." The evidence found by the Commission regarding Mr. Turner's unsatisfactory performance during and his conduct after the operation supported such a conclusion as a matter of law. Mr. Copley testified that Mr. Turner's conduct during the delivery operation was concerning because the operation was in response to a national public health emergency and Mr. Turner's job involved planning and responding to emergencies. He expressed in the June 3 termination letter that Mr. Turner's lack of initiative, leadership, and team participation was especially disturbing. Mr. Copley opined that based on Mr. Turner's conduct during the operation, which was a relatively simple emergency operation, Mr. Turner could not be relied upon in emergency situations.

Mr. Turner argues that since Ms. Woodson and Mr. Copley testified that the operation was satisfactorily and expeditiously performed, the elements of extreme disruptiveness or prejudice warranting immediate severe discipline could not have been present. Mr. Turner's argument, however, ignores evidence that showed his performance during the operation was not the reason the operation was successful. To the contrary, Ms. Neely and Ms. Bobeen, with the deputies' assistance, completed the assigned tasks, and Mr. Turner's behavior during the operation only distracted his co-workers causing them to eventually ignore him all together. The operation was actually shut down that evening partly because Mr. Copley received a phone call from the Sheriff's Office requesting Mr. Turner's removal from the team. Mr. Copley removed Mr. Turner from the delivery team for the next day at Ms. Neely and Ms. Bobeen's request. Further, Mr. Turner's actions in directly contacting the State funding agency to inquire about a possible transfer of the contract to another county threatened the County's relationship and contract with the State agency and showed that Mr. Turner was willing to secure his own continued employment even at the expense of his employer's interests. In light of Mr. Turner's position as a Regional Response Planner for the County and the public health emergency situation, it could reasonably be concluded that Mr. Turner's inappropriate behavior and unacceptable performance was so disruptive, unsafe, or prejudicial to the County, that immediate and severe disciplinary action was warranted.[1] The points are denied.

## Due Process

In three points in his appeal, Mr. Turner contends that he was denied procedural due process during the disciplinary proceedings. First, he argues that he did not receive adequate notice of two of the grounds for his termination: failure to understand the County's pandemic flu plan and its differences from bio-terrorism planning and conduct prejudicial to the

---

1. In one point, Mr. Turner asserts that the Commission failed to take into consideration his performance and disciplinary record as mandated in section 115.460.A, OSCCMo. That ordinance, however, only applies to progressive discipline. *Id.* Progressive discipline was not applied in this case where Mr. Turner's inappropriate behavior and unsatisfactory performance warranted immediate severe discipline as discussed above.

County (his efforts after the delivery operation to open discussions with the State regarding his position). He claims that the two allegations were not included among the specific charges that he was called on to defend in the proceedings.

Mr. Turner cites two cases, *McCall v. Goldbaum*, 863 S.W.2d 640 (Mo.App. E.D. 1993), and *Brixey v. Pers. Advisory Bd.*, 607 S.W.2d 825 (Mo.App. S.D.1980), as support for his argument. *McCall* and *Brixey*, however, involved the notice required under section 36.380, RSMo Cum. Supp.2011, which governs the dismissal of state merit system employees. *McCall*, 863 S.W.2d at 641–42; *Brixey*, 607 S.W.2d at 826–27. Mr. Turner was an employee of St. Charles County, not the State of Missouri, therefore, section 36.380 does not apply in this case.

 Instead, "due process demands that administrative agencies must comply with [their] own rules when terminating an employee." *Jones v. City of Jennings*, 23 S.W.3d 801, 804 (Mo.App. E.D.2000). St. Charles County Ordinances set out a procedure to be followed when imposing severe discipline against a non-probationary employee such as Mr. Turner. They provide that no suspension, reduction in pay, demotion or dismissal shall be taken against a non-probationary employee unless he has been given the opportunity to have a pre-disciplinary review, which is "an informal opportunity for the employee to learn of the proposed severe disciplinary action and to present any information which the employee feels should be considered prior to a final decision being made." § 115.460.D, OSCCMo. Prior to the pre-disciplinary review, the employee must be given the following information in writing:

1. The proposed discipline being considered; and

2. The general reason for the proposed discipline; and

3. The right to a pre-disciplinary review; and

4. The manner in which the employee must schedule the review, or an alternative, the date and time of the review which must be at least two (2) working days following receipt of the notice unless the employee agrees to a shorter time frame; and

5. The opportunity for the employee to bring one (1) person to the pre-disciplinary review; this individual may act as an observer but will not be permitted to take part in the proceeding.

§ 115.460.D.1–5, OSCCMo. "The actual pre-disciplinary review shall be conducted by the appointing authority or his designee. Following the pre-disciplinary review, the information presented by the employee shall be considered and any additional investigation conducted." § 115.460.D, OSCCMo.

Once an appointing authority decides to take severe disciplinary actions after pre-disciplinary investigation and review, it shall give written notice of the chosen disciplinary action to the employee and to the Department of Personnel. § 115.460.-E.2, OSCCMo. The written notice shall include the following:

a. The effective date of the chosen disciplinary action;

b. The reasons for the action . . .

c. The appropriate details which shall include:

(1) References to prior disciplinary actions; and

(2) Except in cases of dismissal, a warning that further unacceptable performance or inappropriate behavior will result in more severe disciplinary action including dismissal.

§ 115.460.E.2.a-c, OSCCMo.

 The County properly followed its ordinances in this case. First, Mr. Turner

was afforded the required pre-disciplinary review under section 115.460.D, OSCCMo. On May 20, 2009, Mr. Copley notified Mr. Turner in writing that the Department was considering severe disciplinary action and that a pre-disciplinary hearing would be held. Specifically, in his twelve-page letter, Mr. Copley explained that the Department was considering a term of suspension without pay or dismissal. He further set the general reasons for proposing severe discipline including that Mr. Turner was "hired for the specific purpose of assisting in regional planning for public health emergencies;" that "a major part of your job is to cooperate, collaborate and coordinate a process to identify and to suggest new and innovative programs for Region C by working with your peers in local public health agencies throughout the region;" that he "should clearly understand the concepts and practices of Incident Command;" that "the Unites States Government formally declared the H1N1 (Swine Flu) disease outbreak a Public Health Emergency;" and that "the Department of Community Health and the Environment was operating under a declared national public health emergency and was guided by the Department's comprehensive Pandemic Influenza Response Plan." Mr. Copley explained that Mr. Turner's behavior during the actual public health emergency was far below satisfactory standards and that he failed to perform acts that it was his duty to perform.

A pre-disciplinary review hearing was then held on May 28, 2009. Mr. Turner did not respond in full detail to the May 20 notice of disciplinary action, expressing his concerns that the decision had already been made. He, however, agreed that Mr. Copley could consider his written rebuttal to the earlier written reprimand as responsive to the notice. Mr. Turner also informed Mr. Copley for the first time that he had contacted the State about moving the CRI contract that funds his position to another jurisdiction. Under section 115.460.D of the County's ordinances, Mr. Copley was permitted to consider this additional information in making his ultimate decision about discipline.

On June 3, 2009, Mr. Copley notified Mr. Turner in writing that he would be dismissed from his position with the County effective June 4, 2009. Included in the twenty-page letter detailing the reasons for his dismissal, Mr. Copley again explained that Mr. Turner was hired for the specific purpose of assisting in regional planning for public health emergencies and that his actions during the public health emergency were far below satisfactory standards. He further stated that Mr. Turner's act of contacting the State regarding transferring his position was prejudicial to the County and that based on that action, he had rendered service below satisfactory standards. Specifically, the letter provided:

I also consider your contacts with staff of the Missouri Department of Health and Senior Services (DHSS) to seek a means to have the contract which funds you transferred to another health department in the CRI region to be prejudicial to the service. You have no authority to negotiate contracts with DHSS nor can it be in any way considered acceptable for you to imply that there are problems with St. Charles County carrying out its contractual obligations by asking if the contract can be given to another agency. . . .You have rendered service that is below satisfactory standards or have otherwise become subject to disciplinary or other corrective measures as detailed above. This includes your contact with DHSS requesting that the contact be reassigned.

The notice received by Mr. Turner was adequate to inform him of the reasons for

his dismissal as required by the County's ordinances. The points are denied.

Finally, Mr. Turner contends that the County erred and violated constitutional provisions in failing to maintain a constitutionally adequate separation of its prosecutorial and adjudicative functions. He asserts that the same counsel that represented the County also represented the Commission, which adjudicated the disciplinary hearing.

 "The procedural due process requirement of fair trials by fair tribunals applies to an administrative agency acting in an adjudicative capacity." *Fin. Solutions & Assocs. v. Carnahan,* 316 S.W.3d 518, 522 (Mo.App. W.D.2010)(internal quote and citation omitted). "Decisions rendered by an administrative body are presumed to be valid, and appellants carry the burden of overcoming this presumption by establishing unfairness in the procedure." *Scrivener Oil Co., Inc. v. Crider,* 304 S.W.3d 261, 272 (Mo.App. S.D.2010)(internal quotes and citation omitted). By their nature, administrative agencies perform a combination of investigatory and adjudicatory functions. *State ex rel. Martin–Erb v. Mo. Comm'n on Human Rights,* 77 S.W.3d 600, 610 (Mo. banc 2002). Such combination of functions does not violate the strictures of the due process clause. *Id.*; *Matter of Duncan,* 541 S.W.2d 564, 568 (Mo. banc 1976)(citing *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). It is a difficult burden to prove that " 'the combination of investigatory and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication.' " *Carnahan,* 316 S.W.3d at 525 (quoting *Withrow,* 421 U.S. at 46–7, 95 S.Ct. 1456). To do so, one must " 'overcome a presumption of honesty and integrity in those serving as adjudicators.' " *State ex rel. Martin–Erb,* 77

S.W.3d at 610 (quoting *Withrow,* 421 U.S. at 47, 95 S.Ct. 1456).

Mr. Turner cites *Commonwealth of Pennsylvania, Dep't of State v. Chairman,* 31 Pa.Cmwlth. 615, 377 A.2d 1022 (1977), to support his contention that an impermissible commingling of the prosecutorial and adjudicatory functions occurred during the hearing before the Commission. In *Chairman,* two podiatrists appealed the suspension of their professional licenses claiming that they were denied procedural due process by the commingling of judicial and prosecutorial functions when the Board of Podiatry Examiner's solicitor presented the case for the Commonwealth and then made evidentiary rulings, gave advice to the Board members, and was instrumental in drafting the formal adjudication and order. *Id.* at 1023. The Commonwealth Court of Pennsylvania found that the actions of the Board's solicitor created an impermissible appearance of possible prejudice and remanded for a new hearing. *Id.* at 1024.

This case is, however, distinguishable from *Chairman* where the same attorney represented the Commonwealth before the Board and also advised the Board during the hearing. Despite Mr. Turner's assertion in his point relied on that the same counsel represented both the County and the Commission in this case, he acknowledges in his argument that Harold Ellis represented Mr. Copley and the County during the proceedings while Robert Hoeynck served as staff counsel and advisor to the Commission. Mr. Ellis and Mr. Hoeynck are both associate county counselors for the County and occupy the same offices.

The instant case is more similar to *Rosenthal v. Commonwealth of Pennsylvania, State Bd. of Pharmacy,* 73 Pa. Cmwlth. 132, 457 A.2d 243 (1983). In *Rosenthal,* a pharmacist appealed the revoca-

tion of his license asserting that he was denied procedural due process based on the impermissible commingling of prosecutorial and adjudicatory functions during the hearing. *Id.* at 245. One assistant attorney general acted as trial counsel in support of the charges against the pharmacist and another assistant attorney general assisted the State Board of Pharmacy during the hearing. *Id.* The Commonwealth Court of Pennsylvania explained, "Where two attorneys of the same agency appear in different roles in the same proceeding, due process is not per se violated. The focus is whether the function performed by the two are adequately separate so that there is no actual prejudice." *Id.* (internal quotes and citations omitted). The court found that the pharmacist had not specified any actual prejudice and none was found in the record. *Id.*

Here, a review of the record demonstrates that the functions of Mr. Ellis and Mr. Hoeynck were separated. Mr. Ellis appeared on behalf of Mr. Copley and the County and prosecuted the case while Mr. Hoeynck advised the Commission. Additionally, Mr. Turner does not allege and the record does not indicate that Mr. Ellis and Mr. Hoeynck collaborated or that Mr. Ellis had any role in advising the Commission. The record demonstrates neither actual prejudice nor an unconstitutional risk of bias. *See Id.*; *Rocco v. Commonwealth of Pennsylvania, Dep't of Public Welfare,* 100 Pa.Cmwlth. 587, 515 A.2d 113 (1986) (where no allegation was made that an attorney who represented Department of Public Welfare in seeking to terminate pharmacist's provider's agreement under medical assistance program and another attorney from the same Office of Legal Counsel of the Department who advised the adjudicators of the Department collaborated or that the prosecuting attorney had any role in advising the Department, pharmacist was not denied due process rights through alleged commingling of prosecutorial and adjudicatory functions). The point is denied.

### Conclusion

The Commission's decision upholding the termination of Mr. Turner's employment is affirmed. The circuit court's judgment is reversed, and the case is remanded to the circuit court for entry of judgment reinstating the Commission's decision.

All concur.