## INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL UNION NO. 42, Appellant,

v.

## JACKSON COUNTY, Missouri, Respondent.

### WD 79785

Missouri Court of Appeals, Western District.

Filed: August 1, 2017

---

Scott L. Brown, Kansas City, KS for appellant.

Whitney S. Miller, Kansas City, for respondent.

Before Division Two: Cynthia L. Martin, P.J., and Lisa White Hardwick and Alok Ahuja, JJ.

Alok Ahuja, Judge

David Mitchell's employment as an Assistant Prosecuting Attorney in the Jackson County Prosecuting Attorney's Office was terminated in August 2011. Mitchell was a member of Local 42 of the International Association of Firefighters, and his employment with the Prosecuting Attorney's Office was governed by a collective bargaining agreement. Mitchell's union representatives filed a grievance challenging his termination. Following an evidentiary hearing, an arbitrator vacated Mitchell's discharge, and substituted a one-day suspension in its place.

The Jackson County Prosecutor and Jackson County Executive exercised their joint authority under the collective bargaining agreement to review the arbitrator's decision. They issued a joint decision modifying the arbitration award, and reinstating Mitchell's discharge. Local 42 filed suit in the Circuit Court of Jackson County, contending that management's modification of the arbitration award constituted a breach of the collective bargaining agreement. The circuit court granted summary judgment to Jackson County, thereby up-

holding management's decision to terminate Mitchell's employment.

Local 42 appeals. We affirm.

### Factual Background

Mitchell served as an Assistant Prosecuting Attorney from 2001 until his termination in August 2011. Mitchell was one of three attorneys terminated by Jackson County Prosecutor Jean Peters Baker in the summer of 2011, shortly after she took office on May 6.

Like all of the assistant prosecuting attorneys in the Jackson County Prosecuting Attorney's Office, Mitchell was represented by Local 42 of the International Association of Firefighters. At the time of Mitchell's termination, Local 42 and Jackson County were parties to a collective bargaining agreement which specified the terms and conditions of the assistant prosecuting attorneys' employment. Local 42 filed a grievance concerning Mitchell's termination, and the parties advanced to arbitration under the collective bargaining agreement's grievance procedure.[1]

Mitchell's termination grew out of his conduct in the case of *State v. Oswaldo Chavez*, No. 0916-CR05742, filed in the Circuit Court of Jackson County. The *Chavez* case originated in a tip from a confidential informant to Jackson County Sheriff's Deputy Caleb Carter. Based on the tip, a car that Chavez was driving was stopped and searched on November 13, 2009. A substance believed to be methamphetamine was found in a hidden compartment on the passenger side of the vehicle. Chavez gave a post-arrest statement to Deputy Carter. He was ultimately charged with attempted trafficking of a controlled substance.

Defense counsel in the *Chavez* case filed a written discovery request on April 27, 2010. Although Mitchell contended that he provided responsive discovery materials to defense counsel informally, it is undisputed that Mitchell provided no *written* response to defense counsel's discovery request until March 22, 2011, eleven months after the request was filed.

After an earlier continuance, the *Chavez* case was set for trial on Monday, March 21, 2011. On March 15, 2011, Chavez's counsel filed a motion to exclude the prosecution's witnesses, due to Mitchell's failure to respond to discovery. On Thursday, March 17, 2011, Mitchell filed an Application for Continuance, in which he stated that "[t]he State's continuance request is due to the State has yet to receive laboratory report on the drugs."

A hearing was held in the *Chavez* case on Friday, March 18, 2011. At that hearing, Mitchell informed the court that "the Independence Crime Lab has a backlog and they have yet to test the drugs, so I'm trying to get them to expedite that." In response, defense counsel stated that her investigator had contacted the crime lab the day before, and the lab indicated that it had no record of a request for drug testing. Defense counsel argued that the reason the prosecution did not have any report of a laboratory analysis was that the prosecution had never requested testing of the substance seized in November 2009. In response, Mitchell made a series of statements to justify the delay in testing the seized substance:

> Your Honor, in response, what she alleges, that there was no request for the drugs to be tested, is not accurate. I had Dept. Ledean in my office, and we called over to the Crime Lab. The drugs

---

1. The grievance concerning Mitchell's discharge, like the grievances concerning the discharges of the other two assistant prosecutors, was arbitrated before Josef Rohlik, a retired professor from the St. Louis University School of Law.

just made it to the Crime Lab in December of last year[, and were in the police department's property room until that time].

. . . .

And according to the deputy, what they're starting to do now is to send [substances to be tested] over to KCPD because they can get them back in a more timely fashion. But at this point, your Honor, the backlog for Independence Crime Lab is just a huge backlog.

. . . .

And I just found out Wednesday that the drugs had not been tested when Dept. Ledean was in my office, and he called the Crime Lab and he verified that it had not yet been tested. So I just found that out Wednesday, and I filed the application for a continuance yesterday. So—

When defense counsel expressed confusion as to why the seized evidence had been sent to the Independence Crime Lab, rather than to Kansas City, Mitchell explained that this occurred "[b]ecause KCPD didn't recover the drugs; Jackson County Sheriff's Department recovered the drugs. So, therefore, it went to the Independence Crime Lab."

Later in the hearing, defense counsel stated that, on a break, she had contacted the Independence Crime Lab herself, and was told that they had no record of any substance associated with the *Chavez* case. Mitchell responded:

I don't understand that because Dept. Ledean, if I'm pronouncing it correctly, he called from my office and verified that the drugs were there, they had arrived in December. So I don't know what information [defense counsel] gave them. But he did call to verify they were there, that they had not yet been tested.

So when she said that they're not there, the State—is that her statement is in error. They are there. They're just waiting to be tested.

In reliance on Mitchell's statements, the circuit court denied Chavez's motion to exclude the State's witnesses, and continued the trial of the case to July 18, 2011.

As the arbitrator found, despite Mitchell's repeated statements to the circuit court, "[i]t is undisputed that there has not been any detective named Ledean. It is also undisputed that the substance to be tested has never been in any Independence lab." To the contrary, the evidence reflected that, on March 16, 2011, an officer with the Jackson County Sheriff's Department requested that the State Highway Patrol Crime Laboratory in St. Joseph conduct "rush" testing of the seized substance; the officer made the March 16 request at Mitchell's direction. There was no evidence of any prior request that the evidence be tested.

At the arbitration hearing, Mitchell claimed that he referred to "Deputy Ledean" at the March 18, 2011 hearing in error, and that he instead intended to refer to Sheriff's Deputy Tony Uredi. Mitchell claimed that Deputy Uredi is the one who informed Mitchell that, "per procedure, they took [the seized substance] to the Independence Crime Lab." Mitchell testified that Deputy Uredi was with Mitchell, in Mitchell's office, when they spoke to the Independence Crime Lab by telephone, although Mitchell testified that could not recall if that occurred on March 16, 2011 (as he represented to the court on March 18), or instead on another date. Mitchell testified that, as a result of his further inquiries, he later learned that the substances had instead been taken to the Highway Patrol Crime Lab in St. Joseph. Deputy Uredi testified at the arbitration hearing that he had never met with Mitch-

ell in Mitchell's office, and was never with Mitchell when the crime lab was called concerning the status of drug testing.

One other discovery issue from the *Chavez* case figured in this disciplinary proceeding. As described above, Chavez's vehicle was stopped based on a tip provided by a confidential informant to Jackson County Sheriff's Deputy Caleb Carter. Chavez also made a statement to Deputy Carter subsequent to his arrest. Mitchell later learned that Carter's employment with the Sheriff's Department had been terminated. Despite Deputy Carter's central role in the investigation of the underlying offense, and despite his discovery obligations, Mitchell made no effort to investigate the reasons for Carter's discharge, and (at least in his statements prior to the arbitration hearing) admitted that he had not provided any information to Chavez's counsel concerning Carter's discharge.

At Chavez's trial, the court refused to submit to the jury the charge of attempted trafficking in the first degree, but instead submitted the lesser charges of possession of a controlled substance with intent to distribute, and simple possession. Chavez was acquitted by the jury of all charges.

Following the *Chavez* trial, management in the Prosecuting Attorney's Office conducted an investigation of Mitchell's conduct in the case. As a result of this investigation, Mitchell was provided with a Notice of Discharge, stating the following reasons for his termination:

1. Willful violation of Missouri Supreme Court Rule 4-3.3, Candor Towards the Tribunal, by knowingly making a false statement of material fact and failing to correct the same. This occurred in State v. Oswaldo Chavez, 0916-CR05742 by representing to the court at a March 18, 2011 hearing that you had ensured that the drugs at issue in the case were being tested at the Independence Crime Lab and that you had been unaware until the preceding Wednesday, the date on which you stated to the court that you had been notified by Deputy Ledean from the Jackson County Sheriff's Office, that the drugs had not yet been tested.

2. Willful violation of Missouri Supreme Court Rule 4-3.3, Candor Towards the Tribunal, by knowingly making a false statement of material fact and failing to correct the same. This occurred in State v. Oswaldo Chavez, 0916-CR05742 by representing to the court at a March 18, 2011 hearing that you had in-person communications in your office with Deputy Ledean, an employee of the Jackson County Sheriff's Office, when no such person is employed by the Jackson County Sheriff's Office and no other employees of the Jackson County Sheriff's Office had any in-person communications with you on March 16, 2011, the date you represented to the court.

3. Willful violation of your obligations as a prosecutor to fully investigate and seek out materials under Missouri Supreme Court Rule 25.03 and Missouri Supreme Court Rule 4-3.8 by failing to inquire into the reasons that Caleb Carter is no longer employed by the Jackson County Sheriff's Office.

4. Failure to comply with discovery obligations under Missouri Supreme Court Rule 25.02 and 25.03(A) and 25.03(C) in State v. Oswaldo Chavez 0916-CR05742 by failing to timely file a response to discovery to defense counsel's request.

Local 42 filed a grievance contesting Mitchell's discharge, and the matter proceeded through the grievance procedure to arbitration. Following an evidentiary hearing, the arbitrator issued his decision con-

cerning Mitchell's discharge on October 10, 2013. The arbitrator found that the County had proven the first three grounds stated in Mitchell's Notice of Discharge. Thus, the arbitrator found that Mitchell's false identification of the *Independence* Crime Lab as the location where the seized substances were located "was intentional and misled the court for the purpose of routinely granting the continuance." The arbitrator reasoned that this was not an inadvertent error, since "[t]he identification of the particular lab was necessary to claim severe backlog, which was the vehicle for claiming the necessity of continuance." The arbitrator also found that Mitchell's "repeated references to Ledean, i.e., forgetting Uredi, cannot be viewed as a mistake." Although the arbitrator stated that he could not know Mitchell's reason for the misidentification, he noted that, if Deputy Uredi had been accurately identified, it could have resulted in Deputy Uredi contradicting Mitchell's version of events at the March 18, 2011 hearing.

With respect to Mitchell's failure to investigate, and disclose, the circumstances of Deputy Carter's discharge, Mitchell testified for the first time at the arbitration hearing that he had, in fact, notified defense counsel (informally) that Deputy Carter had been fired. The arbitrator found that "Mitchell's memory recall testimony informing the Public Defender about Caleb Carter is pathetic and his evasive testimony on this matter cannot be credited." The arbitrator stated that he "consider[ed] this to be a very serious matter because Caleb Carter was a person who could have provided the Public Defender with a valuable information if it existed."

With regard to the fourth specification in Mitchell's Notice of Discharge—his failure to prepare timely discovery responses—the arbitrator found that "the evidence ... makes absolutely clear the ten day limit on responses to discovery request is ignored, and, as such may not be a basis for discipline."

Although the arbitrator found that the County had established that Mitchell made intentional misrepresentations to the circuit court, and that Mitchell had committed "very serious" misconduct by failing to investigate and disclose information concerning Deputy Carter's dismissal, he nevertheless held that the County was not entitled to impose the severe discipline of discharge. The arbitrator relied for this conclusion largely on his decision in the arbitration concerning the discharge of another Assistant Prosecuting Attorney.[2] The arbitrator noted that there was no record of any prosecutor being disciplined prior to Peters Baker's appointment as Prosecuting Attorney in May 2011, and that, instead, an "'anything goes' atmosphere" prevailed. As stated in his decision in the companion case, the arbitrator concluded that,

> [I]f new rules, new totally different disciplinary concept is imposed it must be clearly communicated to the employees with some formality, usually in writing, to insure that all employees have been notified. The new rules must be clear, understandable, and absolutely must include discipline with some precision. ... [N]o notice satisfying the above requirements was given. The notice requirement is an absolute condition of

---

**2.** The other prosecutor was Bryan Krantz. In Krantz's case, as here, the arbitrator rejected the Prosecuting Attorney's decision to terminate Krantz; the Jackson County Prosecutor and Jackson County Executive then reviewed and rejected the arbitrator's conclusion that

Krantz could not be discharged; and the circuit court upheld management's decision. The Krantz case is pending in this Court as *International Association of Firefighters, Local Union No. 42 v. Jackson County*, No. WD79563.

discipline in the arbitration practice, an indispensable element of just cause, unless the behavior in question is so severe that the discharge, rather than just "a discipline," must be viewed as self-evident consequence of the behavior.

Having found that Mitchell lacked notice that his intentional misrepresentations and discovery misconduct could result in discharge, the arbitrator concluded that his "hands are tied, and the penalty may not exceed the usual near minimum under the progressive discipline concept": a one-day suspension. The arbitrator also ordered that Mitchell "be reinstated and made whole for all losses suffered during his separation from the Prosecutor's Office except for one day of back pay."

The Jackson County Prosecutor and County Executive exercised their right under the collective bargaining agreement to review the arbitrator's decision. On October 30, 2013, Peters Baker and County Executive Michael Sanders jointly issued an 81-page Modification of Arbitrator's Decision and Joint Ruling, in which they reversed the Arbitrator's decision and upheld Mitchell's termination.

Following the modification decision, Local 42 filed suit in the Circuit Court of Jackson County, alleging that the modification of the arbitration award constituted a breach of the collective bargaining agreement. The parties filed cross-motions for summary judgment. On May 16, 2016, the circuit court granted the County's motion and denied Local 42's motion, and thereby sustained the termination of Mitchell's employment as effected by the modification decision.

Local 42 appeals.

## Standard of Review

As a general proposition, " '[w]hether to grant summary judgment is an issue of law that this Court determines *de novo.*' " *Owners Ins. Co. v. Craig*, 514 S.W.3d 614, 616 (Mo. banc 2017) (citation omitted).

Article VI, § 3(C) of the collective bargaining agreement gives the Jackson County Prosecuting Attorney and County Executive the authority to jointly review, and to jointly modify, an arbitrator's decision. Section 3(C) provides in relevant part:

Decisions of the arbitrator are subject to review jointly by the Prosecutor and the County Executive, who may modify the arbitrator's decision only when the findings of fact and decision of the arbitrator are clearly contrary to the weight of the evidence, viewed in its entirety, together with the legitimate inferences which may be reasonably drawn from the evidence and in the light most favorable to the findings of fact and the decision of the arbitrator. ... The written ruling shall be subject to judicial review in the Circuit Court of Jackson County, at which time this court shall have the authority to overturn the ruling if it does not comply with this Article.

Our task in this appeal is to determine whether the Prosecuting Attorney and County Executive properly exercised the modification authority granted to them by Article VI, § 3(C) of the collective bargaining agreement. The parties do not dispute that we should decide this question by applying the same standard of review to the arbitrator's decision which the Prosecuting Attorney and County Executive were contractually obligated to apply. Thus, the question we must answer is whether "the findings of fact and decision of the arbitrator are clearly contrary to the weight of the evidence, viewed in its entirety, together with the legitimate inferences which may be reasonably drawn from the evidence and in the light most

favorable to the findings of fact and the decision of the arbitrator."

## Discussion

Multiple provisions of the parties' collective bargaining agreement are relevant to the issues presented on appeal. On the first page of the collective bargaining agreement, under the heading "Purpose and Intent," the parties recite that they "are committed to advancing and practicing the highest of ethical standards as embodied by the Rules of Professional Conduct adopted by the profession." In Article II, § 1, the agreement also recognizes the Prosecuting Attorney's management rights:

Except as otherwise provided herein, the County, through the Prosecuting Attorney, and in accordance with state law and the County's Charter and Code, possesses the sole right to operate and manage the Prosecutor's Office. Without limiting the generality of the foregoing, the County, through the Prosecuting Attorney, possesses and retains the right to:

A. Determine the mission of the Prosecutor's Office;

B. Direct the working forces;

C. Hire, assign, promote, transfer or layoff bargaining unit members;

. . .

E. Discipline and discharge for just cause;

. . .

G. Take whatever other action may, in its judgment, be necessary to carry out the mission of the Prosecutor's Office . . .

The agreement provides that

[t]he Prosecutor recognizes that any actions by any attorney in his/her employ must comply with the rules of professional conduct outlined by Missouri Supreme Court Rule Four. Further, the Prosecutor recognizes that under Missouri Supreme Court Rule 4 he/she is ultimately responsible for any violation of the Rules of Professional Conduct by any attorney in his/her employment, if he/she orders or, with knowledge of the specific conduct, ratifies the conduct involved.

Article V of the collective bargaining agreement is headed "Disciplinary Proceedings." It provides in relevant part:

**Section 1. Covered Actions**

As provided in Article II, Section I, E above, Management may impose discipline for just cause. Such discipline will be pursuant to a system of progressive discipline. All disciplinary actions are covered by this Agreement and are subject to the grievance procedure. . . .

**Section 2. Just Cause**

The Prosecutor shall not discipline or discharge any employee covered by this Agreement, except for just cause. . . .

**Section 3. Appeal of Discipline**

As noted above, all disciplinary matters shall be subject to the grievance procedure, including arbitration. . . .

The grievance procedure is outlined in Article VI of the collective bargaining agreement. Article VI begins by stating that

The Union and the Employer desire to have a fair, effective, and productive means to resolve disputes that arise in the work place. Matters subject to this grievance procedure include matters related to the interpretation and application of this Agreement, existing rules, policies, procedures and binding past practices of the parties.

Article VI describes a multi-step grievance procedure, culminating in arbitration. Article VI, § 3(C) provides that "[a]rbitration shall be the last and final step in the

grievance procedure. The arbitrator shall have no authority to add to, subtract from, or modify any of the terms of this Agreement." As described above, Article VI, § 3(C) also provides for the review of arbitration awards jointly by the Prosecuting Attorney and County Executive. Article VI, § 4 specifies that "[g]rievances or appeals of disciplinary action shall be processed through the grievance procedure, as described herein, except that probationary employees are not entitled to arbitrate disciplinary action or disputes involving seniority."

In this case, the parties dispute whether the arbitrator appropriately cited to federal caselaw, and private-sector labor arbitration decisions, to give meaning to the collective bargaining agreement's "just cause" standard. It is unnecessary for this court to resolve those issues, however, because even under the arbitrator's reading of the "just cause" standard, progressive discipline and prior warnings are not required before discharging an employee, if the conduct is as severe and egregious as Mitchell's conduct in this case.

The arbitrator held that Mitchell could not be terminated, despite having committed serious misconduct, because he had not received explicit notice that his actions could result in termination, and because the County was required to engage in progressive discipline. The arbitrator acknowledged in his decision, however, that "progressive discipline and notice may not apply in self-evident cases of exceptional severity." In his decision in the companion case, the arbitrator explained that even if progressive discipline is considered to be an element of "just cause,"

> [i]t is ... universally accepted that there may be behavior which is so abhorrent to everybody that it may justify a discharge for the first offense, despite progressive discipline, even without a specific rule or other notice.... Some such offenses may be viewed as self-evident causes for discharge, such e.g. as intentional infliction of injury to a patient in the nursing home.

The arbitrator's recognition that progressive discipline and prior notice are not required in the case of severe or egregious misconduct is supported by private-sector labor arbitration decisions. As the leading treatise on labor arbitration explains:

> It is said to be "axiomatic that the degree of penalty should be in keeping with the seriousness of the offense." In this regard, an arbitrator explained:
>
> > Offenses are of two general classes: (1) those extremely serious offenses such as stealing, striking a foreman, persistent refusal to obey a legitimate order, etc., which usually justify summary discharge without the necessity of prior warnings or attempts at corrective discipline; [and] (2) those less serious infractions of plant rules or of proper conduct such as tardiness, absence without permission, careless workmanship, insolence, etc., which call not for discharge for the first offense (and usually not even for the second or third offense) but for some milder penalty aimed at correction.

Kenneth May, ELKOURI & ELKOURI: HOW ARBITRATION WORKS § 15.3.F.i, at 15-44 to 15-45 (8th ed. 2016) (footnotes omitted); *see also id.* at § 15.3.F.xi, at 15-80 ("no warning is required where the offense is serious and legally and morally wrong"). The treatise similarly observes that, although generally "[a]n employee must receive clear notice of both what the employer expects as well as the range of penalties that may be imposed for failing to meet the employer's expectations," these notice requirements do not apply "where the conduct was clearly wrong." *Id.* at § 15.3.F.x, at 15-78. The treatise cites to a variety of

examples of conduct in which progressive discipline, and prior warnings and notice, are unnecessary, including: insubordination; intoxication, fighting or theft at work; selling drugs on company property; or sleeping on duty.[3]

Under the labor arbitration principles applied by the arbitrator, Mitchell's conduct in the *Chavez* case was sufficiently egregious to warrant his immediate dismissal, without regard to the system of progressive discipline, and irrespective of any prior notice or warnings Mitchell had received. We focus solely on the first two grounds for termination asserted in Mitchell's Notice of Discharge: his intentional lying to the circuit court during the March 18, 2011 hearing. The arbitrator found that, to persuade the circuit court to continue a trial date and to deny the defendant's motion to exclude evidence, Mitchell intentionally fabricated a fictitious Sheriff's Deputy, and then falsely described conversations which he and the fictitious deputy had purportedly had with the Independence Crime Lab. Mitchell repeatedly claimed at the hearing that the seized evidence was at the Independence Crime Lab, when he knew that the material was at the Highway Patrol Crime Lab in St. Joseph, where he had just requested "rush" testing (through a Sheriff's Deputy) on March 16.

Mitchell repeatedly lied to the court in order to conceal his own failure to timely request that the seized evidence be tested. His lies had the effect of shifting blame onto other law enforcement agencies (the police property room which had purportedly failed to timely forward the evidence to the crime lab, and the crime lab which purportedly then failed to promptly test the evidence). Mitchell used his lies to call into question the truthful statements made to the court by defense counsel (that the Independence Crime Lab had no record of receiving evidence connected to the *Chavez* case). Mitchell's lies had the effect of delaying a criminal defendant's trial for several months, and arguably denied the defendant the dismissal to which he was entitled as a result of the prosecutor's delays. Moreover, rather than acknowledging his falsehoods, at the arbitration hearing Mitchell attempted to explain them away, claiming (falsely) that his references to "Deputy Ledean" were mistaken references to Deputy Uredi, and claiming (falsely) that he and Deputy Uredi had called the Independence Crime Lab together.

The fact that Mitchell's lies to the court were egregious, and clearly wrong, should literally "go without saying." It is a bedrock principle of attorney ethics that lawyers must be truthful to the court. Rule 4-

---

**3.** The same principles have been recognized in connection with public employment. As the New Jersey Supreme Court has explained,

> [a]lthough progressive discipline is a recognized and accepted principle that has currency in the [Merit System Board]'s sensitive task of meting out an appropriate penalty to classified employees in the public sector, that is not to say that incremental discipline is a principle that must be applied in every disciplinary setting. To the contrary, judicial decisions have recognized that progressive discipline is not a necessary consideration when reviewing an agency head's choice of penalty when the

> misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest.

*In re Herrmann*, 192 N.J. 19, 926 A.2d 350, 359 (2007); *see also Turner v. Copley*, 351 S.W.3d 49, 57-58 (Mo. App. W.D. 2011); *Bollinger v. Wartman*, 24 S.W.3d 731, 734 (Mo. App. E.D. 2000) (both cases affirming administrative conclusions that a public employee's misconduct was sufficiently severe to warrant immediate discharge, without application of progressive discipline).

3.3(a)(1) of the Rules of Professional Conduct unambiguously provides that "[a] lawyer shall not knowingly ... make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Making knowing, affirmative false statements to a court is among the most serious acts of professional misconduct an attorney can commit. As the Missouri Supreme Court has only recently reiterated, "[g]enerally, 'when an attorney, with an intent to deceive the court, submits a false document, makes a false statement, or withholds material information, disbarment is the appropriate sanction.'" *In re Krigel*, 480 S.W.3d 294, 301 (Mo. banc 2016) (quoting *In re Caranchini*, 956 S.W.2d 910, 919 (Mo. banc 1997)); *see also* Am. Bar Ass'n, STANDARDS FOR IMPOSING LAWYER SANCTIONS 6.11.

The obligation to be forthcoming and candid with the court is heightened for prosecutors, who wield enormous power over the life and liberty of other persons. The Missouri Supreme Court emphasized the unique role of prosecuting attorneys 130 years ago (in a case in which a prosecutor repeatedly misrepresented the evidence during closing argument):

> Prosecuting officers, even in the heat of debate, ought not to forget that they owe a duty to the defendant as well as to the state; to the state, to fairly prosecute, and to endeavor to secure conviction by all proper methods and legitimate modes; to the defendant, to refrain from doing or saying aught which the highest sense of professional honor will not sanction.

*State v. Pagels*, 92 Mo. 300, 4 S.W. 931, 934 (Mo. 1887). The United States Supreme Court made similar observations in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

> [A prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88, 55 S.Ct. 629. Consistent with this caselaw, the collective bargaining agreement provides—on its first page—that the parties "are committed to advancing and practicing the highest of ethical standards as embodied by the Rules of Professional Conduct adopted by the profession."

When Mitchell intentionally and repeatedly lied to the court, he violated fundamental and obvious standards of professional conduct. Mitchell's misconduct *was* a "self-evident case[ ] of exceptional severity"; under the arbitrator's own analysis, progressive discipline and notice requirements were inapplicable to this egregious misconduct. The history of prior attorney discipline—or lack of discipline—in the Prosecutor's Office to which the arbitrator referred was insufficient to absolve Mitchell of responsibility for his flagrant misconduct, or immunize him from the appropriate consequences for that misconduct.

Given the arbitrator's findings that Mitchell intentionally and repeatedly lied to the court, his conclusion that Mitchell's immediate discharge was unwarranted was

"clearly contrary to the weight of the evidence, viewed in its entirety." The Prosecuting Attorney and County Executive acted within their authority under Article VI, § 3(C) of the collective bargaining agreement in modifying the arbitrator's decision, and reinstating Mitchell's discharge.

### Conclusion

The judgment of the circuit court is affirmed.

All concur.